LESSIE GRACE, Administratrix, v. MINNEAPOLIS & ST. LOUIS RAILROAD Co., Appellant.

**Railroads:** CROSSING ACCIDENT: NEGLIGENCE: EVIDENCE. In this action for the death of an interurban conductor by a collision at a crossing of defendant's track, the evidence of negligence on

the part of defendant's engineer is such as to require a submission of that question to the jury.

Same: DUTY TO KEEP A LOOKOUT. Although a steam railway train is entitled to precedence on approaching an interurban crossing, and the employees of the interurban company are bound to keep a lookout for approaching trains, yet that fact will not justify the trainmen of the steam railway in assuming· that the crossing is not a place of danger; but they are nevertheless required to keep a lookout to ascertain whether the crossing is in use by the interurban company when approaching it.

Same: INSTRUCTIONS: APPLICABILITY TO ISSUES. Where the failure of the engineer of a steam railway train to stop, as required by statute, on approaching the crossing of another like railroad was not alleged as· a ground of negligence, and the court in its instructions made no reference to the subject, a requested instruction that the interurban railway, although at the time operating a train by a steam engine, was not a steam railway within the meaning of the statute requiring their trains to stop on approaching a crossing, was not within the issues and properly refused.

Same: EVIDENCE: HARMLESS ERROR. Where there was nothing in the evidence justifying a finding of negligence because of defendant's failure to stop its train on approaching the interurban crossing, admission in evidence of the articles of incorporation of the interurban railway, on the theory that they tended to prove that the railway might be operated ·in part by steam power, was not prejudicial.

Same : CROSSING AGREEMENT: CONTRIBUTORY NEGLIGENCE. A provision in the crossing agreement between the two companies that the interurban company .on approaching the derailing switch should stop its cars and the conductor should proceed ahead and flag his car across, did not relieve the defendant from the duty of exercising care to avoid injuring the interurban employees' on their train at the crossing; and where the rules of the interurban company authorized the flagging to be done by a brakeman instead of the conductor, and the injury to the conductor was not the result of the flagging operation, negligence of the conductor could not be predicated on the fact that he ordered the brakeman to flag his train across instead of doing it himself.

Same. Where a brakeman on an interurban train had read and knew the rules of the company, as to stopping and flagging the train over a crossing, and was in no sense an employee of the conductor, but a fellow servant for whose negligence the conductor was not responsible, and there was no evidence that the brakeman failed to perform his duty in flagging the train across,

the fact that the conductor failed to instruct the brakeman as to the method of flagging and the dangers to be apprehended from an approaching engine on defendant's track, was not such negligence on his part as to preclude recovery for his injury and death.

**Same:** FELLOW-SERVANTS: IMPUTED NEGLIGENCE. A brakeman employed by a railway company is not the servant or personal representative of the conductor of the train with respect to the conductor's safety, and they are not so related in the discharge of their duties that the negligence of one will be imputed to the other.

**Same:** DEGREE OF CARE: INSTRUCTION. Where an exercise of a high degree of care by decedent would not have averted the accident, the defendant was not prejudiced by an instruction that decedent was required to exercise reasonable care for his own safety rather than a high degree of care demanded by the circumstances.

**Same:** DAMAGES: INSTRUCTION. Where the jury in a personal injury action is limited to a consideration of the present loss to decedent's estate, and is told to consider only his age, occupation, wages, condition of health, ability to earn money, habits of industry and probable duration of life, concerning which there was evidence, and are further told that decedent was liable to die at any time, failure to instruct as to the contingencies of ill-health, non-employment, diminution of earning capacity, which are entirely speculative, and to suggest that a verdict for any amount not exceeding that prayed for, might be returned, was not erroneous, in the absence of a request therefor.

**Same.** Where the court made no suggestion in its instructions that it would be proper to return a verdict for the amount prayed for, and the verdict was for less than that amount, defendant was not prejudiced by an instruction limiting the recovery to the amount asked.

**Same:** EVIDENCE: INTEREST TABLES. Interest tables relate merely to matters of computation, and their exclusion when offered to show what a certain sum would amount to at different rates, for a period approximating decedent's expectancy, was not erroneous.

**Same:** EXCESSIVE VERDICT. In this action for the death of an interurban conductor, in view of his age, earning capacity and accumulations, a verdict for $11,000, is held excessive and is reduced to $8,000.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

TUESDAY, DECEMBER 12, 1911.

ACTION to recover damages for the death of plaintiff's intestate, Bertram H. Grace, alleged to have been caused by the negligence of the employees of the defendant company in operating its road. There was a verdict for plaintiff, and from judgment on such verdict the defendant appeals.— *Affirmed on condition.*

*George W. Seevers, W. H. Bremner,* and *E. D. Samson,* for appellant.

*Bannister & Cox,* for appellee.

McCLAIN, J.—The defendant operates a line of railway from Minneapolis to Des Moines through the town of Perry, in Dallas county, and the Interurban Railway Company operates a line of railway from Des Moines through Perry, crossing the track of the defendant company at grade about a mile southeasterly from Perry. At this crossing, the line of defendant's railway runs approximately north and south, Perry being to the north, and the line of the interurban railway is approximately east and west. The general surface of the country is level, so that a train approaching the crossing from the north may be seen from the crossing for a distance of two or three miles. About 3 o'clock on the morning of December 16, 1909, an extra engine of defendant was being run from the north towards this crossing in charge of an engineer and fireman. The headlight and classification lamps on the front of the engine were burning. The engine was stopped for a few minutes at Perry, and then was started south towards the crossing in question at full speed; the object of the engineer being to reach the next station south, seven miles distant, in time to meet and pass a train scheduled to arrive from the south at that station in about fifteen minutes. As he was required by

the rules of defendant company to be in the clear at least five minutes before the time of the arrival of the train which he was to meet, he had not more than eleven minutes in which to run the distance of seven miles. At the crossing in question, the defendant's engine struck the caboose of a freight train on the interurban railway as it was crossing defendant's track, and instantly killed plaintiff's intestate, the conductor of the interurban freight, who was in the caboose.

The interurban railway is a trolley line, operated in general by electric power, but during the period of its construction an ordinary railway steam engine was used on its line, and this engine had, prior to the accident, been used to haul a freight train daily each way between Des Moines and Perry, although freight cars were also hauled by trolley engines. The freight train with which defendant's engine collided at the time of the accident was hauled by this steam engine.

At the crossing in question, no interlocking system had yet been installed, but there was a derailing switch on the interurban line, in the operation of which it was necessary that any car or train should be stopped before reaching the crossing, and could not proceed until an employee had gone ahead across defendant's track and closed the switch by means of a lever at a switch stand; there being such a switch stand on each side of the crossing at a distance of seventy-four feet to the west and sixty-five feet to the east of the crossing. These switch stands are on the south side of the interurban track. During the nighttime, each of these switch stands is provided with a light, about six feet from the ground, these lights being so arranged that when the switch is open they show red east and west along the interurban track and green to the north and south along the defendant's track; and when the switch is closed, ready for the crossing of defendant's track by the interurban cars, they show red along the defendant's track and green along the interurban track. Near the crossing is a signal standard, about twenty

feet high, belonging to and operated by the interurban company, so arranged that when the switch is open the light placed thereon shows green along the defendant's track and red along the interurban track, and when the switch is closed, ready for the crossing of defendant's track by the interurban cars, it shows red along defendant's track and green along the interurban track. The lights on the signal standard and on the switch stands were burning and in proper condition for operation at the time of the accident. By an agreement between the two companies, it was the duty of the interurban company to maintain the derailing switch, and stop its cars before they reached the defendant's track, and not to cause its cars to proceed across defendant's track until flagged over the crossing by the conductor, whose duty it should be to assure himself that no train or car was approaching the crossing upon the tracks of the defendant company, before closing the derailing switch and signaling his car or train to proceed.

The interurban freight train with which defendant's engine collided, hauled by a steam engine, as already indicated, consisted of four cars and a caboose; the total length of the train being about two hundred and thirty-four feet. As it approached the crossing from the east, it was stopped by the engineer before the derailing switch was reached, and one Davis, the head brakeman, carrying a lantern, got down on the north side of the engine and went ahead to the crossing, where he stopped, looking both north and south for approaching engines or cars on the defendant's line. Davis testified that he saw nothing that looked like a headlight or other light, or an approaching engine or train, and observed only two lights to the north, not moving, probably three-fourths of a mile distant. He then proceeded to the switch stand west of defendant's track, and lined up the derail by the operation of the switch, and again went back to defendant's track, and observed it in each direction without seeing any headlight approaching or hearing any whistle or bell;

whereupon he gave the signal to his engineer to come ahead on the crossing, standing in the middle of the track until the engine of his train reached him, when he mounted the engine; and that, as he was looking back to see if the rear brakeman was going to get off to operate the switch after the train had crossed, his attention was attracted by the exhaust of defendant's engine coming from the north, and he noticed sparks from its smoke stack. Although he at once warned his engineer of the approaching danger, defendant's engine struck the caboose before the train could be gotten clear of the crossing.

As to the negligence of defendant's engineer, there was a clear case for the jury. He testified that as he left Perry, he saw a green light on the signal standard at the crossing,

1. RAILROADS: crossing accident: negligence: evidence.

but did not look again at the light before the collision; and the evidence tended to show that had he looked he would have seen this light show red in time to have stopped his engine on the danger signal and avoided the collision, for, although the red lights on the switch stand may have been cut off from his view by the passing train, the red light on the signal standard could not have been thus obstructed from his view.

The contention for appellant is that its engineer was under no obligation to look out for such danger signal, as it was the duty of the interurban company to look out for an

2. SAME: duty to keep a lookout.

approaching engine on the defendant's track, and have its train clear of the crossing. The argument is that the defendant owed no duty with reference to avoiding a collision at the crossing different from that which it owed to trespassers or mere licensees attempting to cross its track at any other place on its right of way; that is, the duty to avoid a collision, if possible, after the danger of such collision became apparent. It seems to us that this argument is not sound. The employees of defendant were bound to know that the crossing was a place of danger, and

that it might rightfully be in use by cars of the interurban company. The fact that the defendant's engine was entitled to precedence at the crossing, and that it was the duty of the employees of the interurban company to look out for the approaching engine on defendant's track, did not justify defendant's engineer in assuming that the crossing was not a place of danger. The situation was analogous to that existing where a highway crosses the track of a steam railroad. The trains operated along the railway track are entitled to precedence at such crossing, and the traveler on the highway approaching the crossing is bound to look out for approaching trains; nevertheless it is the duty of the engineer on such an approaching train to be on the lookout for persons at the highway crossing, and he is not justified in wholly disregarding possible danger to a traveler, and assuming that such traveler on the highway will avoid the possibility of being struck by an engine. *Illinois Central R. Co. v. Benton,* 69 Ill., 174; *Pittsburg, F. W. & C. R. Co. v. Dunn,* 56 Pa., 280; *Texas & P. R. Co. v. Cody,* 166 U. S. 606, (17 Sup. Ct. 703, 41 L. Ed., 1132).

The duty to be on the lookout for possible dangers to persons crossing the track exists also at places where, as is known to the railway company, persons are in the habit of crossing, although it is no public highway. *Thomas v. Chicago, M. & St. P. R. Co.,* 103 Iowa, 649; *Booth v. Union Terminal R. Co.,* 126 Iowa, 8; *Bourrett v. Chicago & N. W. Co.,* 152 Iowa, 579. And we have recently held that a railway company must exercise reasonable care to avoid injury to a landowner using a private crossing, although, of course, the trains are entitled to precedence at such crossings, and the landowner is under obligation to use the crossing with a view to his own safety with reference to its use by the railway company, and to keep out of the way of approaching trains. *Ressler v. Wabash R. Co.,* 152 Iowa, 449. Likewise, where a street railway line crosses a steam railway track, although the trains of the steam railway may be entitled

to precedence, and it may be the duty of the street railway employees to keep out of the way of a train on the steam railway track, nevertheless it is the duty of the employees of the steam railway in charge of its trains to be on the lookout for danger and give warning of their approach. *Missouri, K. & T. R. Co. v. Batsell*, (Tex. Civ. App.), 34 S. W., 1047. And the same rule applies as between two steam railway trains approaching a common crossing, although one of them may have the right of way over the other. *Chicago & A. R. Co., v. Rockford, R. I. & St. L. R. Co.,* 72 Ill., 34; *Pratl v. Chicago, M. & St. P. R. Co.,* 38 Minn. 455, (38 N. W., 356); *Chicago, K. & W. R. Co. v. Ransom,* 56 Kan., 559 (44 Pac. 6). It is clear, therefore, that the engineer on defendant's engine, charged with knowledge of the interurban crossing and of the right of the interurban railway to use such crossing, was bound to be on the lookout for danger at such crossing, and could not heedlessly approach it without observing whether a danger signal had been displayed.

II. If the interurban company was operating a steam railway, then, regardless of any agreement between the two companies, it was the duty of the defendant to stop its engine not less than two hundred feet from the crossing (Code, section 2073); whereas, if the interurban railway was a "railway operated by electric or other power than steam" (Code Supp., section 2033-a), then no such duty to stop rested upon the defendant company. Code Supp., section 2033-e. As the negligence of defendant's engineer might be shown, and was shown, otherwise than in failing to stop his engine before reaching the crossing, it is immaterial to determine what was the character of the interurban railway in this respect, unless it may be necessary to do so in order to determine whether there was error in giving certain instructions requested for the defendant. Failure to stop the engine on approaching the crossing was not alleged in the petition as

3. SAME: instruc-
tions: appli-
cability to
issues.

constituting negligence on the part of defendant's engineer, and the court, in its instructions, nowhere referred to any such duty. An instruction, asked by the defendant on the theory that the interurban railway, although it used this one steam engine in operating certain of its trains, was not a steam railway, but in the contemplation of statute an interurban railway, was not therefore pertinent to any issue in the case nor any question submitted by the court to the jury. The court imposed upon the defendant by its instructions no other duties than those to which it was subject, if the interurban railway were, within the meaning of the statute, operated by electric or other power than steam.

Error is assigned on the admission in evidence of the articles of incorporation of the interurban railway, on the theory that they tended to prove that it was a railway which might be operated in part by steam power; and the argument now is that as this evidence was admitted the jury should have been guarded against giving it improper application. In view of the questions submitted to the jury, the evidence was probably wholly immaterial, but we can not see that it could possibly have prejudiced the defendant. Nothing in the record would have justified the jury in finding negligence on the part of defendant in not stopping its engine before approaching the crossing, as required by statute in case of steam railway crossings, and no instruction on the subject was therefore necessary.

*4. SAME: evidence: harmless error.*

III. The contention that decedent was conclusively shown to have contributed by his own negligence to the injuries causing his death is presented in several phases. It is said, in the first place, that it was his duty, under the agreement between the two companies and the rules of his own company, to have gone ahead of his train and himself given the signal to the engineer to proceed over the crossing.

*5. SAME: crossing agreement: contributory negligence.*

The agreement between the companies was immaterial on this question. Although it specified that when an interurban car or train approached the derailing switch it should stop, and the conductor should proceed to flag his train across, it did not relieve the defendant company from its duty to exercise care to avoid injury to the employees of the interurban company engaged on or about its train, and the injury to deceased did not result from the flagging operation having been performed by the head brakeman, instead of by the conductor, unless, indeed, as is argued, we should say that if the conductor had been performing this service, instead of remaining in the caboose, he would not have been injured. But the fact that under some other conditions he would not have been injured does not at all indicate that he was negligent in remaining on his train. The rules of the interurban company authorized the operation of flagging by the brakeman in place of the conductor, and in this respect no negligence of the conductor, in view of such rules, was shown.

In the second place, it is argued that the conductor was in charge of his train, and was negligent in not giving to the brakeman proper instructions as to the method of

6. Same.

flagging and the dangers to be anticipated in the event that an engine was approaching on the defendant's track. There is much evidence in the record as to the rules and notices of the interurban company with reference to the flagging of trains across such crossings, and of the duties of conductors to advise themselves with reference to such rules and notices. We find it unnecessary to go into the details of this evidence. It appears that Davis, although an experienced brakeman on steam railroads, was running for the first time as brakeman on the interurban road; but he had been given a set of rules, and had read, among others, a rule to the effect that at railroad crossings cars must be brought to a full stop at a safe distance, and the motorman must not proceed until the con-

ductor has gone ahead to the center of the crossing, looking both ways, and given the "come ahead signal." Davis must have known from this rule what he went ahead to look for, and must have understood that he was charged with the duty of looking out for an approaching engine on the defendant's track. The evidence shows that he did everything that he was required to do under the specific rules and notices relating to this crossing, and if the conductor did not give him full and specific directions, his failure to do so contributed in no way, so far as can be gathered from the evidence, to the accident. Davis was not employed by the conductor, but was a fellow servant, for whose negligence, if any, decedent was not responsible. The only negligence suggested on Davis' part was the failure to see the approaching engine after taking all the precautions which the rules required to be taken, or which could have been suggested by reasonable care.

In the third place, it is argued that the negligence of Davis must be imputed to decedent. If Davis had been the servant of decedent or his personal representative with 7. SAME: fellow-servants: imputed negligence. reference to his own safety, there might be some basis for this argument; but counsel for appellant have not cited any authorities in support of the doctrine that, as between coemployees, the negligence of one is to be imputed to the other, unless it be the case of *Minster v. Citizens' R. Co.,* 53 Mo. App., 276, which seems to have been decided upon the authority of *Thorogood v. Bryan,* 8 C. B., 115, which has been fully and often repudiated as an authority in this state. See *McBride v. Des Moines City R. Co.,* 134 Iowa, 398, and cases there cited. And to the general effect that a conductor and a brakeman on a train are not so related in the discharge of their duties that the negligence of the latter will be imputed to the former, see *Baltimore & O. R. Co. v. Baugh,* 149 U. S., 368, (13 Sup. Ct., 914, 37 L. Ed., 772); *New England R. Co. v. Conroy,* 175 U. S., 323, (20 Sup. Ct., 85,

44 L. Ed. 181). The abrogation in this state of the 'fellow servant rule· as to railroad employees does not, of course, have the effect of making one of two coemployees, whose negligence occasions injury to the other, the servant of the latter, so that such negligence shall be imputed to him. The effect of our statute is to enlarge the liability of the employer, and not to impute to one employee, as contributory negligence, the fault of a coemployee which has occasioned the injury.

The cases cited by counsel for appellant, relating to alleged contributory negligence of decedent as conductor, are not in point. It is, of course, true that if the conductor of a train, in the exercise of his authority, causes the train to be operated in a negligent· manner, or acquiesces in such negligent operation with knowledge thereof, or fails to discharge his duties as conductor in such a way as to contribute to his own injury, he can not recover on account of an accident to which he has, by his own fault, thus contributed. By way of illustration of the extent and applicability of these general propositions, see *Dewey v. Chicago & N. W. R. Co.,* 31 Iowa, 373; *Lane v. Central Iowa R. Co.,* 69 Iowa, 443; *Nordquist v. Great Northern R. Co.,* 89 Minn., 485, (95 N. W. 322). But decedent had the right, under the rules of the company, to direct Davis, as brakeman, to flag his train past the crossing in question, and when Davis undertook to discharge this duty he ·acted as the servant of the interurban company, and not simply as the servant or personal representative of the conductor. If Davis did those things which the rules of the company required to be done, then his negligence, if any, in not seeing the approaching train was the negligence of the company, and not the negligence of decedent; and it is immaterial in this case whether decedent gave to Davis all the instructions which should have been given to him, provided Davis did, under the circumstances, everything which the rules of the company required to be done. The negligent manner of

doing the acts required, and which Davis attempted to do, was not chargeable to the decedent. There was no violation of the rules on the part of Davis, nor omission of any precaution which the rules prescribed; if he was at fault, it was in failing to see what he should have seen while flagging the train through in the manner prescribed by the rules.

Instructions of the lower court, relating to the general subject of negligence and contributory negligence, are criticized, but on reading them together we see no just ground of complaint. It would be futile to attempt a discussion of them, piece by piece, in order to prove that, taken together, they fully and correctly state the law. It is not contended that on the whole the propositions of law applicable to this case, relating to negligence and contributory negligence, were not sufficiently covered. With reference to the care required of Davis, it is contended that the jury was improperly directed to find whether he exercised ordinary care—that is, the care which a person of ordinary caution and prudence would exercise under the circumstances; the claim being that under the circumstances a very high degree of care was required. But we have already indicated that decedent was not chargeable with the negligence of Davis in performing the acts required to be performed in flagging his train over the crossing; that is, in not seeing what he ought to have seen in performing these acts. Therefore, if there was any error in this respect, it would not affect defendant's liability; for decedent was where he had a right to be, and had done everything which he was required to do. There was nothing in the rules of the company nor in the circumstances of the case requiring him to keep a personal lookout for an approaching engine on defendant's track, if his train was being flagged over the crossing in the manner required by the rules of his company. The definition of the care required of decedent as "reasonable care for his own safety," instead of the high degree of care which the circumstances

8. SAME: degree of care: instruction.

required, was immaterial, and not prejudicial, even if erroneous, for the jury could not have found that, even in the exercise of the high degree of care which the circumstances required, he omitted to do anything which, if done, would have tended to prevent the happening of the accident.

IV.   As to measure of damages, there are assignments of error in the giving of instructions for failing to instruct the jury to consider contingencies, such as ill health, non-employment, and diminution of earning capacity with advancing age, and in suggesting to the jury that a verdict might be returned for any amount, not exceeding $15,000, the amount of recovery prayed for in the petition. These assignments are not well taken. The jury was limited to a consideration of the present pecuniary loss to decedent's estate resulting from his death, and allowed to take into consideration only his age, occupation, wages, condition of health, ability to earn money, habits as to industry, and probable duration of life, and was further told to bear in mind that deceased was liable to die at any time, and that there was no certainty that he would have lived to the end of his expectancy. These were the matters as to which evidence had been received. The instructions seem to be fully supported by what has been said by this court in *Lowe v. Chicago, St. P., M. & O. R. Co.,* 89 Iowa, 420; *Spaulding v. Chicago, St. P. & K. C. R. Co.,* 98 Iowa, 205; *Hammer v. Janowitz,* 131 Iowa, 20.

9. SAME:
   damages:
   instruction.

The elements of contingencies of life, such as ill health, nonemployment, and diminution of earning capacity as age advances were included in the instruction approved in the case last cited, but, as they are entirely speculative, we think that the omission to call attention to them does not constitute reversible error, unless a special and appropriate instruction is asked on the subject. These are matters of ordinary human experience which the jury may be presumed to take into account in determining what the decedent would probably have earned.

The necessary limitation of the verdict to an amount of recovery not exceeding that prayed for in the petition, was unnecessary, in view of the issues as stated to the jury, and might well have been omitted. But there

10. SAME.

was no suggestion that a verdict in the amount prayed for would be proper under the evidence, and the jury did not assume that it was so directed, for the amount allowed in the verdict returned was $11,000; whereas the amount prayed for in the petition was $15,000. There was no error in this respect in the instruction as given. *McGovern v. Interurban R. Co.,* 136 Iowa, 13.

V. The defendant offered in evidence certain interest tables, for the purpose of showing what one dollar will amount to at different rates of compound interest for periods approximating the expectancy of life of

11. SAME: evidence: interest tables.

decedent. There was no error in rejecting these tables. They related to mere matters of computation, which could be made by any person able to compute interest. It is not contended that an instruction should have been given on the subject. If it was the duty of the court to advise the jury with reference to the method and basis of computing the present worth of decedent's prospective net earnings, the court could have done so on its own knowledge, without the introduction of such tables. They were no more necessary to enable the jury to reach a correct verdict than ordinary interest tables would have been, had the case involved the allowance of interest for a specified time, at a prescribed rate on a fixed sum of money.

VI. Finally, it is contended that the verdict was excessive, and this, to our mind, raises the most difficult question in the case. The deceased was twenty-eight years old,

12. SAME: excessive verdict.

with an expectancy of about thirty-five years, and in his employment as conductor, had been earning on the average about $70 per month for three months preceding his death. Prior to that, in various occupations, he had been earning from $50 to $70 per month.

At the time of his death, he had accumulated an estate of about $1,350. In similar cases, we have sustained verdicts ranging from $5,000 to $8,000. *Hively v. Webster County,* 117 Iowa, 672; *Haas v. Chicago, M. & St. P. R. Co.,* 90 Iowa, 259; *Locke v. Sioux City & P. R. Co.,* 46 Iowa, 109; *Rose v. Des Moines Valley R. Co.,* 39 Iowa, 246. We think that an allowance of more than $8,000 as damages to decedent's estate, resulting from his death, would be excessive, and reach the conclusion that the trial court erred in sustaining the allowance made by the jury. If the plaintiff shall see fit to accept a judgment for $8,000, the case may stand affirmed. On refusal to accept a judgment for that amount, it must be reversed. The plaintiff may file such election in this court within thirty days after the final announcement of this opinion, and have an affirmance entered. On failure to make such election, the case will be remanded, and the plaintiff will have the same time after remand to file such an election in the trial court. If no such election is filed on remand of the case, the lower court shall proceed to a new trial as upon a reversal. Costs of the appeal are taxed to appellant.

The judgment of the trial court is therefore *affirmed on condition.*