Marguerite Shutes et al., Administrators, Appellees, v. Evert Weeks, Appellant.

No. 42890.

September 24, 1935.

Rehearing Denied December 19, 1935.

Stipp, Perry, Bannister & Starzinger and Putnam, Putnam, Langdon & Fillmore, for appellant.

Doran & Doran, and Brammer, Brody, Charlton & Parker, for appellees.

RICHARDS, J.—In this action at law plaintiffs-administrators seek to recover damages on account of the death of their decedent, Leslie C. Shutes, from injuries sustained in an automobile collision. Defendant's liability is predicated upon his alleged negligence. There was a judgment for plaintiffs. Defendant has appealed.

Between 1:30 and 2 o'clock a. m. on September 3, 1933, in the city of Des Moines, two automobiles, being operated the one by decedent Shutes and the other by defendant, came into collision upon the intersection of 31st street, which extends north and south, and Ingersoll avenue, which extends generally east and west, but with some curvatures. The paving on 31st street south from Ingersoll avenue is 30 feet in width. On Ingersoll avenue the distance between curbs is 60 feet, the north 20 feet being paved, the south 20 feet being paved, the middle 20 feet being occupied by two street car tracks.

Defendant claims plaintiffs failed to show that Shutes was free from contributory negligence, and claims that the evidence upon the whole record established as a matter of law that Shutes was guilty of negligence contributing in a substantial degree to his accident and death. These claims were grounds of defendant's motion for a directed verdict. The overruling of this motion is the first error relied on for reversal. Defendant's proposition is that the physical facts show conclusively that the defendant's automobile, approaching the intersection from the west, was in plain sight when Shutes, upon entering the intersection, looked or should have looked for approaching traffic on

Ingersoll avenue, and that consequently Shutes was negligent in entering the intersection when a collision was visibly imminent.

There was evidence from which the jury could have found the following facts: That Shutes, approaching the intersection, driving north on 31st street, brought his car to a complete stop at a point where the front end of the car was 8 to 15 feet south of a projection across 31st street of the line of the south curb of Ingersoll avenue; that Shutes and one Marquis, who was riding with Shutes in the front seat, both then looked down Ingersoll avenue, to the right, and then to the left; that Marquis looked again; nothing coming from either direction was seen on Ingersoll avenue; that after these observations Shutes started the car and proceeded across the intersection to a point where the front end of his car had reached approximately the south line of the 20-foot strip occupied by the tracks, when and at which place the collision occurred; that four or five seconds of time elapsed between the stopping and the starting again of the Shutes car; that in the operation of starting the car and proceeding across the intersection Shutes was shifting the gears and had not yet put the car into high gear before the collision; that in the opinion of witness Marquis the Shutes car had reached a speed of 10 miles per hour when the collision occurred; that the distance traveled by the Shutes car after being started, following the stop, until the collision, was about 28 to 35 feet; that defendant, approaching from the west on the south 20 feet of paving on Ingersoll avenue, was driving 70 miles per hour, and the front end of his car rammed into the left side of the Shutes car at about its front door with terrific impact.

About 300 feet west of the point where Shutes stopped his car and looked west as testified, there is a high retaining wall at the property line on the south side of Ingersoll avenue, and about 30 feet west of the retaining wall Ingersoll avenue curves somewhat to the south, on account of which facts the view of the whole of the south 20 feet of paving on the south side of the tracks, on Ingersoll avenue, extends only about 400 feet west from the place where Shutes stopped his car, although the line of vision of a portion of said paving extends west probably an additional 100 feet to a point where the line of vision reaches the north edge of said paving, west of which point no part is visible. Under the testimony the jury could have found that a portion of the four or five seconds that the car stood still was occupied in

using the mechanism necessary to again start the car after the occupants looked down Ingersoll avenue, and could have found that a number of seconds were consumed after the car was in motion in progressing the 28 to 35 feet. The jury could have found from the testimony of Marquis that he estimated the Shutes car had attained a speed of 10 miles per hour when it had reached the tracks and the collision occurred. Appellee calculates the time consumed from starting the car to the collision at about five seconds if the estimated speed mentioned by Marquis be used as the basis of calculation. We think the jury could have found that defendant's car was not within the vision of Shutes at the instant when he started his car after making observations as described, preliminary to crossing the intersection. The reason is that, speaking in terms of time, defendant's car traveling at 70 miles per hour was only about four seconds or five seconds distant from the collision when it was first in possible sight, dependent upon whether we consider the 400 feet distance or the 500 feet distance above mentioned. An ordinance of the city of Des Moines, in evidence, designates Ingersoll avenue as a boulevard and provides that it is unlawful for the driver of any vehicle to cross any boulevard without first bringing the vehicle to a stop. Defendant says that if Shutes had looked when he was approximately at the south curb line of Ingersoll, it is apparent that he would have seen the defendant's car approaching from the west and that Shutes then should have again stopped his car, which defendant says could have been done almost instantly. In other words, defendant claims Shutes should have looked again when approximately at the south curb line of Ingersoll avenue, and that Shutes would have seen defendant approaching, citing Hittle v. Jones, 217 Iowa 598, 604, 250 N. W. 689, 692. In that case the following language is used:

"A mere stop at the stop sign is not enough. The purpose of the stop is to enable the driver who stops the better to make efficient observations on the highway as due care may require. * * * An efficient observation; therefore, could not be made alone at the stop sign, but the observer would be required not only to make observation at the stop sign but to continue his observation as he left the stop sign and approached the paved portion of the highway. * * * By this is not meant that the traveler entering the primary highway from a side street must

necessarily constantly look from side to side on the primary highway until he has crossed the same. What, in fact, is required of such traveler crossing a primary highway is that he make observations at such times and places as due care under the circumstances demands. Plainly due care required that the appellant's intestate in the case at bar, immediately before entering upon the paved portion of the primary highway, make observations for an approaching automobile that might be expected thereon.''

The conclusion in the last sentence of the foregoing quotation was warranted by the facts in the Hittle case. The distance that the plaintiff's intestate in that case was required to travel after stopping at the stop sign and before reaching the primary road he was crossing was 40 feet, and the court recognized that while the intestate would be occupied in starting the car and driving 40 feet some imminent danger at the intersection of a primary highway might stalk into the picture. The facts in the Hittle case further justify the conclusion of the court as to the negligence of the intestate in that the car on the primary highway, which came into collision with intestate's car, was plainly in sight of intestate and but 80 or 90 feet away when the intestate entered the intersection.

In the case before us there is not such evident lack of care on the part of Shutes as on the part of intestate in the Hittle case. This is partly because the questions, whether Shutes would have seen defendant's car had he again looked when approximately at the south curb line, after traveling 8 to 15 feet, and if he would have seen it whether he would have had a reasonable opportunity to stop his car a second time in a place of safety, is all dependent on things that happened within a very few seconds of time and at a time when visibility was lessened by darkness of night. The location of the Shutes car when defendant's car, approaching, could be seen is a matter dependent on calculation, and the factor of rate of speed of Shutes car, on which the calculation largely depends, is not a definite thing, but is itself dependent on opinion testimony. The location of the Shutes car at the instant defendant's car came into sight is one of the facts involved in answering the question what was required of Shutes in the exercise of ordinary care if it be agreed that Shutes should have looked again at approximately the intersection. As it de-

pends on a calculation of a very few seconds, perhaps fractions of seconds of time, it seems to us reasonable minds could easily differ in determining that location and in determining whether it was a place where there remained time and opportunity to stop the car in a place of safety, in the exercise of ordinary care. Other differences of opinion might arise on the fact situation as to what must have been visible to Shutes had he looked to the west just before entering Ingersoll avenue. Shutes cannot be bound to have seen in the darkness objects at a distance unless revealed by artificial light. It is in evidence that there was a street light at the corner where Shutes stopped and that there were other lights on Ingersoll avenue, and there is the evidence of Marquis that he could see to Crescent drive about 500 feet west. But seeing to a certain point at night does not necessarily mean that the intervening spaces were illuminated, and there could be in the minds of fair and reasonable persons difference of opinion as to the extent the illumination of Ingersoll avenue revealed an approaching car, if not within an area illuminated by one of the street lights. The extent of visibility made possible by the street lights is not shown, but is more or less a matter of inference from a rather meager showing. Defendant says Shutes was bound to see the headlights on defendant's car. But, the evidence on that subject would have to be an inference drawn by the jury from defendant's testimony. So far as has been pointed out to us, no witness, and we include defendant, says the headlights were lighted as defendant's car approached. Defendant, as a witness, stated he had no recollection of any matter connected with the collision, nor of the collision. He says he remembers nothing from the time he was some blocks west of the place of the collision until he regained consciousness in the hospital, defendant testifying this loss of recollection being the result of injuries received by him. There was one other witness whom defendant overtook and passed some blocks west of the accident who testified he saw the taillight burning, but the witness was not interrogated with respect to any other lights visible on defendant's car. Such evidence on this subject as has been brought to our attention consists in defendant's testimony that when he entered his car and backed it out from a sandwich shop a short time before the accident he turned on the headlights, and that he had his bright lights turned on prior to the period of which he is without recollection. The considerations we have

related convince us that the question of the contributory negligence of Shutes depends on a state of facts on which fair and reasonable minds might differ as to the conclusion to be drawn therefrom and consequently it was a question for the jury. In the foregoing we have expressed ourselves as if adopting defendant's argument that under the facts in this case there was a duty imposed on Shutes to again make observations as to traffic approaching from his left, on Ingersoll, after moving his car a distance of 8 or 15 feet to approximately the south line of the intersection. But in view of our conclusion we need not determine that question, nor consider whether the rules laid down in the Hittle case, supra, as to the duties of one crossing a primary highway, obtain in a situation where the driver is crossing an intersection of city streets. On the facts in Roe v. Kurtz, 203 Iowa 906, 210 N. W. 550, it was held to be a question for the jury whether a driver's failure to look to the left on entering such an intersection contributed to the accident.

██ Defendant says the court erred in giving instruction 18½ which was:

"In arriving at your verdict in this case you will take into consideration the fact that the driver of each of the automobiles in question in this case had the right to assume that the other would not violate the law of the road, as set forth in these instructions, and each had the right to assume that the other would exercise ordinary care in the use and operation of his automobile at the time and place of the accident in question."

Defendant also urges as error the giving of the following portion of instruction 9, namely:

"In the use of the streets the operator of an automobile has the right to assume that others operating automobiles will exercise the care and caution required of them for their own safety and protection and for the safety and protection of others who in the exercise of ordinary care might be using the streets at the same time and place, and he is not called upon to anticipate negligence on the part of the driver of another automobile while so using the streets."

██ Defendant claims these instructions are erroneous because the court did not include a statement that plaintiff had such right of assumption only until he knew or should have

known otherwise. It is true, plaintiff would have no right to assume the existence of a fact which he could see did not exist. Gehlbach v. McCann, 216 Iowa 296, 249 N. W. 144. But a reading of the whole charge to the jury indicates that in the case at bar the jury could hardly have been misled or confused for the following reasons: In instruction 9 the word "anticipate" is used, an ordinary meaning of which is "to foresee, to have a previous view or impression of", and one meaning of the word "assume" is "to take for granted, or without proof; to suppose arbitrarily or tentatively", according to Webster's New Inter. Dictionary. Instruction 14 advised the jury that it was the duty of an operator of an automobile to reasonably use his sense of sight to observe other automobiles, and in instruction 17 the jury was charged that in determining the question of Shutes' contributory negligence they were to consider whether or not he reasonably used his sense of sight to observe the approach of defendant's car. It may also be said in connection with these instructions that the thought that plaintiffs' intestate could assume something he could see was not a fact would not readily occur to the jury as a thought intended by the court, because of its lack of appeal to reason.

Defendant also argues that these instructions were erroneous because the court failed to give the jury directions for applying the general principles announced to the particular facts and issues pleaded. The law of the road in its application to the case is set out in the charge to the jury and we are unable to find error in the court then advising the jury as it did that each party had the right to assume or anticipate the other would observe these duties. With assistance of appellant's argument, we can discover no specific manner in which the court should have enlightened the jury by any more understandable method. The fact should be noted that the instructions complained of accorded to each party the same right to assume the other's observance of the law of the road, so that defendant as well as plaintiffs' decedent had the benefit of these instructions upon the trial. It appeals to us, as a situation in which either party, willing to waive the advantages of the instructions as they stood if there were such advantages as appellant claims, and desiring to have the instructions made more specific as to the matters criticized, should have made request therefor to the district

court, before the event of the trial. Neither defendant nor plaintiffs made such request.

Another error assigned by defendant is the overruling of defendant's motion to strike all and certain vital parts of the testimony of plaintiffs' witness Marquis. This motion was made after the witness had been fully examined and cross-examined. The grounds of the motion were that the testimony was the result of a process of psychology and psychiatry rather than the result of observation, and was not an attempt to repeat to the jury impressions or observations had or made at the time of the accident, but consists of conclusions, deductions, and inferences built through a long course of psychological reflection on the probabilities of the occurrences testified to. This witness sustained head injuries in the collision in question and was unconscious for some time thereafter, and admittedly had some difficulty in the matter of remembering the incidents preceding the collision. In examination in chief he claimed he had personal recollection of the matters of his testimony. On cross-examination he described quite at length his mental processes in recovering this personal recollection he claimed to have, including the manner in which a given fact recalled or held in mind, by its association with other facts assisted in restoring their recollection. This cross-examination was so extended it cannot be here set out nor its details related. But a careful reading indicates that the question raised went to the weight rather than the competency of the testimony and the court correctly ruled on the motion. People v. Mendez, 193 Cal. 39, 223 P. 65.

Defendant says the court erred in giving the following portion of instruction 13:

"In operating an automobile it is the duty of the driver to exercise reasonable and ordinary care in respect to the speed and management of the said vehicle that he may have it under such control as to be able to properly handle and control the same, *and in the exercise of ordinary care he should be able to stop it with reasonable celerity at any time or place to avoid danger and injury to the person or property of another.*"

Defendant says there was error for the reasons, first, that the instruction placed an absolute duty upon defendant to be able at all times and under all conditions, and regardless of

the decedent's contributory negligence or violation of law, to stop his car *and avoid* the accident and injury to plaintiff's decedent, and, second, that the instruction was confusing, contradictory, and misleading. In the foregoing sentence we have italicized the words "and avoid" in order to point out more understandingly wherein defendant claims error. For it will be observed that defendant's assignment of error substitutes the words "and avoid" for the words "to avoid" used in the instruction. In other words, we understand defendant's claim to be that the jury understood, or may have understood, the instruction, as having the meaning it would have had if the words "and avoid" had been used where the words "to avoid" were in fact used. If the words "to avoid" in the instruction are the equivalent of the words "and avoid", then the case of Knutson v. Lurie, 217 Iowa 192, 251 N. W. 147, is authority in support of the claim that there was error. As sustaining defendant's contention, Webster's New Inter. Dictionary gives to the word "to", as one of its meanings, that of "indicating effect, consequence or resultant condition" and indicating "with attainment of, so as to bring about or induce; resulting in". Such meaning of the word "to", in the expression "to avoid danger and injury", etc., in the instruction could lead to interpreting the phrase as synonymous with saying "so as to bring about, as a result, avoidance of danger and injury to the person or property of another". But the same authority also gives to the word "to" a meaning as "indicating intention, purpose, or end", and as "aiming at; with a view of gaining or engaging in; for the making of; as means to an end". If such meaning be adopted, the words "to avoid danger and injury", etc., could be paraphrased with some such words as "for the purpose or aim of avoiding danger and injury", etc. Such, we doubt not, was the meaning the court had in mind. So interpreted, the instruction would not impose the absolute duty to avoid danger and injury, as suggested by defendant. The remainder of the instruction, from which the quoted portion is an excerpt, quite fully and definitely advised the jury on the extent of the duty of drivers of cars on the road with respect to speed and control, including a statement that if a driver was not driving at a greater rate of speed than an ordinarily careful and prudent person would drive under the same or similar circumstances, or was driving at a speed that would permit him

to bring the car to a stop within the assured clear distance ahead, then he would not be negligent in respect to speed. It is also important to note that, as an inseverable part of the sentence containing the alleged error, appears the thought-challenging declaration of the court that it is ''with reasonable celerity'' that a driver should be able to stop. This declaration to the jury was full of inference that the instruction imposes on a driver the duty to avoid danger to others as that desirable aim or purpose may be accomplished by being able to stop with reasonable celerity. The court's statement is inconsistent with the thought of an absolute duty imposed as claimed by defendant. Having the entire instruction before them, the probability that a jury of reasonable intelligence adopted the unintended meaning of the expression ''to avoid'' seems too remote, in view of the whole record in this case, to warrant holding that there was prejudicial error. Nor does it seem there was such error on the grounds that the instruction was contradictory or confusing, as it would not be such if the jury correctly understood the meaning the court had in mind, and that we think was too strong a probability to warrant reversal.

■■■ We have examined the record with respect to the other questions raised by appellant, but find no prejudicial errors therein, with exception of the complaint as to the amount of the verdict of $30,000 reduced by the district court to $21,000. While the record does not seem to warrant a finding that excessive damages appear to have been given under the influence of passion or prejudice, yet, in the light of our precedents, we think that the amount of the verdict, even as reduced, is not sustained by sufficient evidence and should be further reduced, or the case reversed. Decedent was a married man, his age was thirty-four, his expectancy thirty-two years. There was evidence offered that from 1921 to 1933 decedent's average monthly earnings in the tire repair business was $125 to $150; that in 1933 his accumulations consisted of $3,000 cash and household furniture in which $1,000 had been invested and an auto worth $400 and a one-third interest worth $1,000 in the tire repair business; that in April, 1933, decedent purchased a grocery store, the average monthly earnings from its operation being $250; that decedent was industrious and apparently in ordinary health. The case of Scott v. Hinman, 216 Iowa 1126, 249 N. W. 249, is quite comparable with the case at bar with respect to decedent's

age, expectancy, industry, and health. But in the Scott case the evidence of the earning and accumulating ability of decedent was more impressive. Six years before his death he had bought without initial capital two moving picture theaters for the sum of $25,000, and by his industry and management had reduced the debt to $3,000, and still owned the property. The verdict was for $27,000, reduced by the district court to $17,000, and by this court reduced to $14,500. The case of Rastede v. C., St. P., M. & O. R. Co., 203 Iowa 430, 212 N. W. 751, was one in which statutes of Nebraska were recognized as determining the substantive rights of the parties. As these statutes establish a measure of damages not recognized in Iowa, the case is of limited assistance in this discussion. The court permitted to stand a judgment for $14,500 to which amount the district court had reduced the original verdict of $22,500. The Rastede case and the Scott case, supra, are the only instances to which our attention has been called in which, up to this time, this court has permitted to stand a verdict for as much as $14,500 as damages accruing to a decedent's estate by reason of his wrongful death. In Grace v. M. & St. L. Ry. Co., 153 Iowa 418, 133 N. W. 672, decedent was twenty-eight years old, with expectancy of thirty-five years. His monthly earnings had been $50 to $70 per month. He had accumulated an estate of $1,350. The verdict was for $11,000. The court said, "In similar cases, we have sustained verdicts ranging from $5,000 to $8,000." (Citing cases.) A reversal was ordered unless plaintiff should elect to accept $8,000. In Engvall v. D. M. City Ry. Co., 145 Iowa 560, 121 N. W. 12, the age of decedent was forty-six years, his expectancy about twenty-four years. His earnings were $1,000 per year and he had accumulated property worth $2,000. The verdict for $8,250, was reduced to $6,000 by this court. In Rose v. Des Moines Val. Ry. Co., 39 Iowa 246, decedent was unmarried, twenty-four years old, with expectancy of about thirty-eight years and by occupation was a harness maker. He was temperate and industrious and his net annual earnings were $263.11. A verdict for $10,000 was reduced in this court to $5,000. But in considering a present amount as compensation to the estate, the court said, "No one would think of loaning money in Iowa, at less than ten per centum per annum, for it readily brings that rate of interest by the year, and is lawful."

In cases like this the true question always is, What sum of

money will compensate the estate of deceased for the loss sustained thereto by his death? Exactness is impossible, but on that account compensation is not denied. Considering the facts in the light of our precedents, we conclude that the verdict as reduced by the district court was still excessive, and this case is reversed on that account, unless, within thirty days from the filing of this opinion, the appellees file a remittitur of the judgment in excess of $12,000, in which event the judgment of the court below will be affirmed.

Affirmed on condition, otherwise reversed.

All Justice concur.