## EL PASO ELECTRIC CO. v. LEEPER.
### No. 1671—6151.

Commission of Appeals of Texas, Section A.
May 26, 1933.

Brown & Brooke, of El Paso, and Baker, Botts, Andrews & Wharton, of Houston, for plaintiff in error.

Knollenberg & Cameron and E. F. Cameron, all of El Paso, for defendant in error.

CRITZ, Judge.

This suit was filed in the district court of El Paso county, Tex., by Miss Augusta Leeper against El Paso Electric Company, a corporation, for damages for personal injuries alleged to have been received by Miss Leeper as the result of the negligence of the electric company. The case was submitted to a jury on special issues and based on the answers thereto, judgment was entered for Miss Leeper for $7,500. This judgment was affirmed by the Court of Civil Appeals. 42 S.W.(2d) 863. The electric company brings error.

The case is before the Supreme Court on numerous assignments of error, but the view we take of the issue of joint enterprise makes it unnecessary for us to consider any other question.

It is shown by the evidence that while the car in which Miss Leeper was riding, but which was being driven by Lieut. Nutter, was rounding a curve on a wet paved road it left the pavement and struck one of the transmission wire poles belonging to the electric company. Four people were riding in the car at the time, to wit: Miss Leeper, Lieut. Nutter, Lieut. Howze, and Mrs. Howze. Miss Leeper was badly injured, and Mrs. Howze was killed in the accident. It is shown that the accident occurred at night. The pole in question was located at a point in the road right of way, at its intersection with another public road, and about twelve feet from the edge of the pavement of the road on which the car in which Miss Leeper was riding was traveling. Also the point of intersection of the pole was between the two roads.

The jury found the electric company guilty of negligence in placing and maintaining its transmission line pole at the place it was, resultant injuries to Miss Leeper, and the amount of her damages.

The jury also found that Lieut. Nutter, who was driving the car in question at the time of the accident, was negligent, and that his negligence was a proximate cause of the accident.

The electric company contended in the district court, and Court of Civil Appeals, and here contends, that the evidence in this case shows as a matter of law that Miss Leeper and Lieut. Nutter were engaged in a joint enterprise in driving the car at the time of the accident. In this connection, the electric company contends that the evidence in the case shows as a matter of law that Miss Leeper had at least had an equal right with Lieut. Nutter to control the car in which they were driving. It is then contended that the finding of the jury that Lieut. Nutter was guilty of negligence and that such negligence was the proximate cause of the accident entitled the electric company to a judgment.

The evidence bearing on the question of joint enterprise and control of the car is all included in the testimony of Miss Leeper and her mother, Mrs. Wallace. We therefore deem it expedient to quote all of the testimony bearing on that question.

Miss Leeper was sworn as a witness in her own behalf, and touching the question of

joint enterprise and control of the car she testified as follows:

"My name is Augusta Leeper and I am the plaintiff in this case. This is the first time I have ever testified. I am twenty-three years old. I was in this accident down the valley in 1928. The date of the accident was October 30th, the night before Halloween. I should say it was about ten o'clock at night. The car was my mother's, Mrs. George Wallace's. At that time we lived in the Wallace Annex, 1205 Randolph. At the time we were going to the West Ysleta Country Club to a Calumus dance. Lieutenant and Mrs. Howze and Lieutenant Nutter were in the car with me. Lieutenant Nutter was driving the car, he was sitting on the front seat on the left-hand side and I was sitting on the right in front. That was a masquerade, where we all dressed up kind of funny. We were going down to the masquerade dance at the West Ysleta Country Club and I think it was about ten o'clock. When we started to the dance, we started from Lieutenant Howze's. Before that, Lieutenant Nutter came by for me at my home in the Wallace Annex. He came in his own car to my house, a small one-seated car. We stayed for a little while at my house, getting ready to go. Then some people from the same apartment, going to the dance, came to show us their costumes. Lieutenant Nutter was at my home about an hour. My mother was there, she was there in the room when Lieutenant Nutter and I were there. She was looking at our costumes and helping fix them up. Lieutenant Nutter had a costume on, too. When we started to go, we didn't go in this small car of Lieut. Nutter's because we all wanted to go together, the four, the Howzes and Lieut. Nutter and I wanted to go together. If mother would let me have her car, we would all go together.

"By direction of the Court, in order to get the proper understanding of the testimony, the following is written in question and answer form:

"Q. And she let you have the car? A. Yes, sir.

"When we started to get in the car, Lieut. Nutter took the wheel. He drove all of the time until the time of the accident, I didn't do any driving. When we left our house, mother was with us, she was going to Mrs. Kettler's, on Montana, in the 1400 block, we were going to drop her there, which we did, and went to the Post. When we got to Fort Bliss, we stopped at Major Allen's, I wanted to return a crown I had borrowed, then we went to Lieut. Howze's house. We stayed there about a half hour, I think. Then we got in my mother's car again and Lieut. Nutter took the wheel. Lieut. Nutter and I were in the front, he was on the left-hand side and I was on the right, and Lieut. Howze was in the back seat on the left side and Mrs. Howze

on the right. * * * It was raining that night, it had been raining most of the day. It was not raining when we left our house but the streets were wet. When we came out of the Howzes' it was sprinkling. * * * We stopped at Mrs. Kettler's just long enough to let mother out and she spoke to us, then we stopped at the other house about five minutes and I think we stopped at the Howzes' about thirty minutes. Then we proceeded to go to the West Ysleta Country Club. * * * I have driven cars all my life and I had driven this particular car, my mother would turn it over to me, and other cars. * * * I had nothing to do with the driving of the car. The Calumus Club has members and the members invite other people to these dances. There was a bid given to me, Lieut. Nutter wasn't a member of the club, but the bid was given us. I talked to him before and I went in his company to that dance. My mother loaned the car and Lieut. Nutter drove it all the time.

"The bid was given to me for Bill—Lieut. Nutter—by a friend of mine. This car belonged to my mother. As to who suggested using that car that night,—well, you see, it was in the afternoon we decided we would probably go together, Mrs. Howze and I were at a party, she asked who was going to the party, I said we were, she said 'I wish we could all go together,' I said 'I will ask mother if we can have our car,' and when Lieut. Nutter came, mother said we could use her car.

"By direction of the Court, in order to get the proper understanding of the testimony, the following is written in question and answer form:

"Q. You asked your mother if you could use her car and she agreed to that? A. Yes.

"As to who requested Lieut. Nutter to drive,—well I don't know that he was requested to drive. It was sort of by common assent, he always drove. Whenever I was with him in that car, I always let him drive. From my mother's house, we went to Mrs. Kettler's, on Montana, and then Major Allen's and from there to Lieut. Howze's at Fort Bliss. We came out of Fort Bliss on the North Loop Road, at the point nearest Fort Bliss. I think it is three or four miles from there to where the accident happened. I believe it was raining at the time. * * * I don't know which way we were going to take going to the Ysleta Country Club, whether we were going to take the North Loop Road after we got to the junction or whether we were going to turn out and keep on the San Jose Road, we hadn't mentioned that, that was up to Bill. I don't know which way we were going, we didn't say. Nothing was said to Lieut. Nutter as to which road he would take. I didn't know what he was trying to do at the time. * * * I never did say

anything to Lieut. Nutter about driving, or anything of the sort, because I was perfectly at ease and wasn't frightened at any time, and if we are going fast, I am always conscious of it."

Mrs. George Wallace, mother of Miss Leeper, and owner of the car in question, was sworn as a witness for Miss Leeper, and, in so far as the question of joint enterprise and control of the car was concerned, she testified as follows:

"My name is Eva Wallace, Mrs. George Wallace. Augusta Leeper is my daughter. The car in the accident was my car, I had owned it five months. It was a five passenger Chrysler. It was a rather large car, heavy car. I remember the night that the young folks were at my house and going to this party. They left my house about 9:30 and I went with them. I turned this car over to Lieut. Nutter. When we left the house and got into the car, he took the wheel. I went with them to the 1400 block on Montana. My home is on Randolph and Yandell Boulevard and I rode with them to Mrs. Kettler's, on Montana. They stayed there just long enough for me to leave the car. As I got out of the car, I said 'Goodbye, have a good time and take good care of my child.' * * *

"I had been accustomed to letting Augusta and Lieut. Nutter drive my car. Lieut. Nutter and Augusta, upon other occasions, had driven the car with my consent. I loaned it to them whenever she requested. She asked me to let them have that car that evening. It was at Augusta's request that I let them have the car."

Before deciding the legal effect of the above-quoted testimony, we deem it proper to announce certain rules of law touching the question of joint enterprise. Such rules are as follows:

■ (a) Where persons are engaged in a common or joint enterprise and each has an equal right to direct and control the conduct of the others with respect to acts or omissions which contributed to cause an injury to one of them, the negligence of one of such persons is imputed to each of the others. 45 C. J. p. 1020, par. 574.

■■ (b) As applied to occupants of a conveyance, the doctrine of joint enterprise not only requires joint possession thereof by the joint adventurers, but they must also have joint control and responsibility for its operation. Simensky v. Zwyer, 40 Ohio App. 275, 178 N. E. 422. This rule is in harmony with the definition given by the trial court in the instant case. In this regard the trial court charged the jury as follows: "Occupants of a conveyance are supposed to be on a joint expedition where they have not only a joint interest in the object and purpose of the enterprise, but also an equal right, express or implied, to direct and control the conduct of each other in the operation of the conveyance."

We approve the above charge as announcing a correct rule.

■ The jury, as already shown, found that Lieut. Nutter was guilty of negligence in driving the car, and that such negligence was a proximate cause of the accident. Under rule (a) above announced, Miss Leeper therefore cannot recover in this action against the electric company if she and Lieut. Nutter were engaged in a joint enterprise. This is so because if they were so engaged Lieut. Nutter's negligence is in law imputed to her.

A reading of the above rules and the evidence bearing on the question, which we have quoted above, demonstrates that every legal element of a joint enterprise existed as between Miss Leeper and Lieut. Nutter unless it can be said that the evidence raises a fact question as to who had the right to control the car in which they were riding at the time of the accident. If a fact question is so raised, this judgment should be affirmed. On the other hand, if the evidence shows as a matter of law that Miss Leeper had at least an equal right to direct and control the car in which she and Nutter were riding, then she cannot recover.

We have carefully considered the above testimony and in our opinion there is no escape from the legal conclusion that Miss Leeper had not less than an equal right with Lieut. Nutter to direct and control the car in question here. It is shown that the car belonged to Miss Leeper's mother with whom she was then living; she was accustomed to driving this very car; she was of age; she conducted all negotiations with her mother for the loan of the car; she always says that the car was loaned to them, using the plural; there was no agreement or stipulation, express or implied, either as between Miss Leeper and Nutter, or as between them or either of them and Mrs. Wallace, that Nutter was to have the exclusive control of the car or that he was to do the driving exclusively. Miss Leeper testified: "If my mother would let me have the car we would all go together." She further testifies in question and answer: "And she let you have the car? Answer: Yes."

Mrs. Wallace testifies that on the occasion in question Miss Leeper asked her to let them have the car and that she loaned it to them. She also testifies that Lieut. Nutter and her daughter had used the car on other occasions with her consent, and that she always loaned it to them whenever her daughter requested it. Mrs. Wallace's testimony taken in its most favorable light for Miss Leeper shows that the car was loaned to her and Nutter jointly. It is true that Mrs. Wallace says that she turned the car over to Lieut. Nutter but this was a pure legal conclusion. The

facts themselves, viewed most favorably for Miss Leeper, show that at her own daughter's special instance and request, Mrs. Wallace loaned the car to her and to her escort, and that the daughter certainly had as much control over the car as the escort.

Because the verdict of the jury finding that Lieut. Nutter and Miss Leeper were not engaged in a joint enterprise is without support in the evidence, and, in law, contrary to the conclusive evidence, we recommend that the judgments of the district court and Court of Civil Appeals be both reversed and judgment here rendered for plaintiff in error.

CURETON, Chief Justice.

The judgments of the district court and Court of Civil Appeals are both reversed, and judgment rendered for the plaintiff in error, as recommended by the Commission of Appeals.