Glenn A. TONAHILL et al., Appellants,

v.

Thomas Y. PICKETT, Appellee.

No. 3265.

Court of Civil Appeals of Texas.

Waco.

April 28, 1955.

Rehearing Denied May 19, 1955.

Carter, Gallagher, Roberts, Jones & Magee, Ben T. Warder, Jr., Dallas, for appellants.

Strasburger, Price, Kelton, Miller & Martin, Royal H. Brin, Jr., C. C. Renfro, Dallas, for appellee.

HALE, Justice.

This is a suit for damages on account of personal injuries resulting from a collision between two automobiles being operated

over a public highway in opposite directions. Appellants brought the suit against Jimmie Banks and appellee, Thomas Y. Pickett, alleging in substance that the automobile in which they were riding was being operated by Mrs. Tonahill in a westerly direction, while an automobile in which Pickett was riding was being operated by Banks in an easterly direction and that by reason of the negligent manner in which Banks was operating his automobile he caused the same to collide with the automobile in which appellants were riding, thereby inflicting upon them the injuries and damages of which they complained. They further alleged, as a basis for imputing the claimed negligence of Banks to Pickett, that Banks was the agent, servant and employee of Pickett on the occasion in controversy, in that he was acting as Pickett's private chauffeur at that time. In the alternative, they further alleged that if Banks was not in the service of Pickett, then in that event Banks and Pickett were engaged in a joint enterprise so that the negligence of Banks was thereby imputed to Pickett.

Banks answered the suit with a general denial, with pleas of contributory negligence, and with a cross-action against appellants, alleging therein that he was the owner of the 1952 Lincoln he was driving at the time of the collision, and that his Lincoln was damaged in the sum of $3,000 by reason of the negligent manner in which Mrs. Tonahill was operating the automobile of appellants. Thereafter, on December 22, 1953, appellants took the oral deposition of Banks and of Pickett in the case. On September 15, 1954, Pickett filed and presented a motion to sever the cause of action alleged against him from the cause of action alleged against Banks. He also filed and duly presented his motion for a summary judgment that appellants take nothing against him on the grounds that Banks was not his agent, servant or employee on the occasion in controversy, that he and Banks were not engaged in a joint enterprise at that time, and that there was no basis in fact upon which the alleged negligence of Banks could be legally imputed to

him, all as shown by the depositions of Banks and himself on file in the cause. After a hearing based solely upon the pleadings of the parties and the depositions of Banks and Pickett, the court below sustained Pickett's motion for severance and for summary judgment and rendered judgment accordingly.

Appellants predicate their appeal upon the contention that the trial court erred in granting Pickett's motion for summary judgment because the evidence elicited from Banks and Pickett, as contained in their oral depositions, raised a fact issue as to whether or not they were engaged in a joint enterprise at the time and on the occasion in question.

The testimony elicited from Banks and Pickett, as contained in their oral depositions, is without any substantial dispute. Their evidence shows conclusively that Banks was not in the service of Pickett under any contract of hire, express or implied, as a private chauffeur or otherwise, at the time of the collision. Their evidence further shows without dispute that the 1952 Lincoln automobile in which Pickett was riding did not belong to him and that Pickett did not own or claim to own any right, title or interest in or to the same. Therefore, the controlling question presented for our decision on this appeal is whether or not reasonable minds could legally infer or conclude from the testimony of Banks and Pickett, when viewed in the light most favorable to the contention of appellants, that all of the essential component fact elements necessary to constitute a joint enterprise between them existed in this case. If so, the judgment appealed from should be reversed; if not, it should be affirmed.

A joint enterprise, as that term is used in the law of negligence, signifies such legal relationship between two or more persons as to impose responsibility upon each joint adventurer for the negligent acts of the others while acting in furtherance of their common undertaking. Although it is difficult to define the precise relationship giving rise to this term, we think the rule of law applicable to the question be-

fore us is correctly stated in 65 C.J.S., Negligence, § 168, p. 814, as follows: "In order to constitute occupants of a conveyance joint adventurers, there must be not only joint interest in the objects and purposes of the enterprise, but also an equal right, express or implied, to direct and control the conduct of each other in the operation of the conveyance." El Paso Elec. Co. v. Leeper, Tex.Com.App., 60 S.W. 2d 187; LeSage v. Pryor, 137 Tex. 455, 154 S.W.2d 446; Straffus v. Barclay, 147 Tex. 600, 219 S.W.2d 65; Douty v. Delta Drilling Co., Tex.Civ.App., 264 S.W.2d 164 (er. ref. n. r. e.).

In the taking of the oral depositions of Banks and Pickett, counsel for appellants interrogated each of them in detail concerning their past relationships, the objects and purposes which they had in mind in making the trip which they were making at the time of the collision, and the circumstances under which the collision occurred. Obviously, we cannot set forth in this opinion all of the testimony of both of these witnesses, which covers more than 100 typewritten pages. However, in recognition of the privilege and duty of an attorney to present his case honorably to any court in the light which is most favorable to the interest of his client, we quote with approval from appellants' brief, in which they summarize the relationship existing between Banks and Pickett during the years prior to the date of the accident, as follows:

"Thomas Y. Pickett was an evaluation engineer. Jimmie Banks was a colored man who had been employed by Pickett from 1925 to 1935 as his chauffeur. Pickett travelled rather extensively and many times Pickett would take the plane on a trip and Banks would drive his (Pickett's) car to the plane's destination, meeting Pickett there so that he would have an automobile. While he was travelling, Banks would do his chauffeuring and would do his work. Banks did this quite a bit during the war. After the employment of Banks as a chauffeur was discontinued, Pickett paid Banks $100.00 a month until January 1, 1952. This was sort of a retainer, so that Pickett could have Banks do some work for him on special occasions when he needed him. After January 1, 1952, Pickett would sometimes send Banks out to the Melrose Hotel, where he lived, to do some things and Pickett would sometimes send him out to the farm to deliver messages. Pickett, from time to time, loaned money to Banks and, at the time the deposition was taken, Banks owed him about $1,000.00."

The evidence showed that Banks and Pickett each lived in Dallas. Pickett owned a farm in Denton County which was about 20 miles distant from the City of Dallas. The collision in controversy occurred on Sunday morning, March 1, 1953, on the public highway at a point near the Pickett farm. In their brief, appellants summarize the testimony of Banks, in part, as follows:

"On Saturday afternoon, he called Mr. Pickett and asked him if he was going to the farm that afternoon and he said 'No,' and Banks said, 'Well, I got rid of that old Cadillac and I got hold of a Lincoln and I would like to drive you up to the farm this afternoon if you are going, to see if you would like the Lincoln, because it's too big a car for me and I would like to trade it to you for one of those Plymouths.' Pickett said, 'Well, I'm not going.' Banks said, 'Well, what about in the morning? Are you going in the morning?' Pickett said, 'Oh, I don't know.' Banks said, 'Well, you usually go on Sunday morning.' Finally, Pickett said: 'Well, I'll go, but I don't want the Lincoln at all.' Pickett told Banks to pick him up at 8:00 Sunday morning, and Banks did so, and they drove to the farm. Banks explained to Pickett about how he wanted to trade the Lincoln for one of the Plymouths, and Pickett said: 'Oh, I don't like it; they ain't no good; I mighty near killed

myself in one around Lubbock.' After that, he did not discuss the matter any further."

In answer to questions propounded to him by counsel for appellants, Pickett testified in part as follows:

"Q. On that date, as I understand it, you were a passenger—or you were seated in the right front seat of the Lincoln automobile,—A. That's correct.

"Q. —and the automobile was being driven by Jimmie Banks here. A. Yes, sir.

"Q. Is that correct? A. Yes, sir.

"Q. Would you tell me, sir, what you had done on this Sunday prior to the time of this collision? A. Well, the only thing I had done was—Jimmie wanted to show me this car and wanted to trade it to me for a Plymouth, and I told him I was going to the farm, and he asked me if he could take me in the car, and I finally agreed to let him take me up there, and that's all we'd done, is just driven from the Melrose Hotel going to the farm, and as we turned off the road, why, we had the wreck. * * *

"Q. As I understand the situation, and among other purposes, one of the purposes of this trip was to demonstrate the Lincoln to you,—A. Yes.

"Q. —so that you could see how it operated and see if he could sell it to you? A. That's exactly correct.

"Q. And would you say that was the main purpose of the trip? A. That was the only purpose of him going, because I didn't need him to go, and I wasn't sick then and hadn't been operated on, and I didn't need a chauffeur, and Jimmie always wanted to go to the farm; not that I wanted him to go, because twenty miles isn't any distance to drive, as you know. And he wanted me to see this car and wanted me to take it off his hands, is really what he wanted, and there was really no reason for me to go with him in the car except he wanted me to, because I'd told him on Saturday that I wouldn't have the car as a gift and I told hm Sunday morning when he came out to the hotel that there was no reason for him to show me the car, because I wouldn't have it at all."

We think the testimony of Banks and Pickett was wholly lacking in probative force to form the basis for a legal inference that they had a joint interest in the objects and purposes of making the trip to Pickett's farm with an equal right in each to direct and control the conduct of the other in the operation of the Lincoln automobile belonging to Banks.

It is quite clear from the evidence that Pickett was not interested at any time in acquiring the Lincoln, and he was not going on the trip for the purpose of having the Lincoln demonstrated to him, but was going for the purpose of visiting his own farm, as was his usual custom, and to take care of his own personal affairs on the farm. On the other hand, Banks owned no interest in the farm and had no business to transact there, but arranged the trip for the purpose of demonstrating his Lincoln automobile in the hope that he might be able to sell it to Pickett. Thus, there was no joint or mutual interest or business undertaking in which the two were to engage upon reaching the farm.

■ Furthermore, we find no evidence showing or tending to show that Pickett claimed to have any right to direct or control the conduct of Banks in the operation of his Lincoln automobile on the occasion in question, or that he attempted in any wise to exercise such right. On the contrary, Pickett testified that since he was not driving the car, he did not pay any particular attention to the manner in which it was being operated. It may well be that by reason of the long relationship of master and servant previously existing between Pickett and Banks, and because of the other circumstances in evidence, that Banks would have complied with any reasonable request

or suggestion that might have been made by Pickett with respect to the manner in which Banks was operating his automobile. But even though any such request or suggestion had been made by Pickett, and even though such request or suggestion might have been complied with by Banks, such facts would not have changed the legal status of the parties in so far as the right of control over the car was concerned. Under the evidence the status of Pickett, while riding as a passenger in the car of Banks at the time of this collision, was that of a gratuitous guest. Although a guest in an automobile being operated by its owner has a right to warn or protest against the manner in which it is being operated, he has no right to control the conduct of his host in the operation of the same. The evidence completely repels any inference of equality on the part of Banks and Pickett in so far as the right of either to control the conduct of the other in any manner is concerned.

From what has been said, it follows that in our opinion the evidence before the trial court at the time when Pickett's motion for summary judgment was acted upon did not raise any material issue of fact as to whether or not he and Banks were engaged in a joint enterprise, but showed conclusively that such was not the legal relationship existing between them at the time of the collision in controversy. Ener v. Gandy, 138 Tex. 295, 158 S.W.2d 989; Pryor v. LeSage, Tex.Civ.App., 133 S.W.2d 308; Wm. Cameron Co. v. Downing, Tex.Civ.App., 147 S.W.2d 963; Ft. Worth & Denver City Ry. Co. v. Looney, Tex.Civ.App., 241 S.W.2d 322 (er. ref. n. r. e.); Schuhmacher Co. v. Holcomb, Tex. Civ.App., 174 S.W.2d 637; Id., 142 Tex. 332, 177 S.W.2d 951; Siratt v. Worth Const. Co., Tex.Civ.App., 263 S.W.2d 842; Id., Tex.Sup., 273 S.W.2d 615.

Accordingly, the judgment of the court below is affirmed.

McDONALD, C. J., and TIREY, J., concur.