Taft, J.
Plaintiff’s first assignment of error is that “the Court of Appeals erred in reversing and not in affirming the judgment of the ’ ’ trial court; and it will be considered with the fifth assignment that “the judgment of the Court of Appeals is contrary to law” and with the fourth assignment that “the Court of Appeals erred in finding and holding that the Court of Common Pleas erred in submitting to the jury the issue of driving under the influence of alcohol by the defendant’s decedent.”
The only evidence which plaintiff relies upon with respect to that issue is defendant’s exhibit 32ZZ, the testimony of a state highway patrolman and the testimony of a police officer who made a laboratory analysis of decedent’s blood.
Defendant’s'exhibit 32ZZ is a four-page written report of the accident, rendered on an accident report form by two Toledo patrolmen to an inspector of the Toledo Police Department, and *149 was offered by defendant, after identification by the Toledo Law Director, “solely for the purpose of impeaching” the testimony of the driver of the police car. Plaintiff’s attorney, though not objecting to its admission in evidence when offered, stated that he did “not think it * * * competent.” The portion now relied upon by plaintiff as evidence that decedent was under the influence of alcohol reads:
“In answer to my question (Officer Warner) as to whether Mr. Weilnau had any alcoholic beverage, Mr. Weilnau stated yes, that he had a small drink before dinner and also had two Scotch and soda drinks over a period of three hours the last one being about one half hour before the accident. Mr. Weilnau stated he never saw the other car and didn’t know what happened. These statements were made in the presence of both Officers Warner and Beidleman, in Mr. Weilnau’s hospital room * * *."[1]
■The testimony of the state highway patrolman relied upon by plaintiff is as follows:
“Q. Did you make an investigation to determine whether or not Mr. Weilnau had been drinking? A. Yes, sir.
“Q. What did you discover? A. Upon talking to him at the hospital I had to get quite close to hear what he was saying and I noticed the odor of alcohol on his breath and I asked him, inquired if he had been drinking and he said he had a couple of drinks at dinner.”
“ Q. * * * Just what * * * you did in discovering whether or not Mr. Weilnau had been under the influence of liquor? A. I attempted to get a blood test to determine the amount of alcohol he had in his system. ’ ’
“Q. Now, when did you interview Mr. Weilnau at the hospital, at what time? A. I would estimate it was around three o’clock in the morning.
“Q. And at that time you smelled liquor on his breath, didn’t you? A. Yes, sir.”
The testimony of the police officer who made the laboratory *150 analysis of decedent’s blood, relied upon by plaintiff, is as follows :
£<A. Tbe percentage of alcohol in the blood was found to be between 0.05 per cent and 0.10 per cent, that is between 5/100 and 10/100 of one percent.”
££Q. Under the ordinance of the city of Toledo * * * A. * * * If the percentage is 0.15 and over, then a presumption arises that he is under the influence, if the percentage is below 0.05 then the presumption arises that he is not under the influence.
££Q. The measurement shows the alcoholic content was between 0.05 and 0.10. A. Yes, sir.”
££Q. * * * when alcohol is consumed it takes a process of time before it reaches the blood stream does it not? A. Yes, sir.’ ’
í i * * * rigbt after a person drinks * * * an alcoholic beverage, part of that alcoholic beverage is absorbed into the blood stream almost at once, but then of course it takes quite some time, so that the entire contents of the alcoholic drink will be absorbed into the blood stream on the average of between 30 and 90 minutes.
£ £ Q. So that if a man were to take a drink and then immediately enter an automobile to travel, the blood, the alcoholic content in the blood at that time would be considerably less than the amount, say 30 to 90 minutes later? A. Yes, sir.”
££Q. Well, what effect would the eating of dinner have upon him? A. It would retard the absorption of the alcoholic beverage into the blood stream by blocking some of these tiny openings between the inside of the stomach and the inside of the small intestines and the blood stream; you see, it actually acts as a diluting substance, together with an insulating substance, so having a full stomach would retard the absorption of alcohol into the blood stream by slowing it down. ’ ’
“Q. You have no knoiuledge, personal knowledge or hearsay knowledge as to any other conduct of Mr. Weilnau which in any way indicated that he was intoxicated on <that evening other than the test? A. That is true.” (Emphasis added.)
It may well be that an ordinary man, who has had ££a small drink before dinner [about five hours before] and also * * * [after dinner] two Scotch and soda drinks over a period of *151 three hours the last being about one-half hour before” and who has “the odor of alcohol on his breath,” may reasonably be not under the influence of alcohol. The accident occurred outside the city of Toledo, and the testimony as to provisions of its ordinance with respect to the significance of percentages of alcohol in the blood as tending to indicate the influence of alcohol, when contrasted with the testimony as to the percentage of alcohol in decedent’s blood, would hardly tend to prove that decedent was under the influence of alcohol. On the contrary, that testimony, in the absence of evidence of conduct tending to indicate some lack of sobriety, tends to prove that he probably was not. Certainly, without some definite expert testimony to explain the significance of the percentage of alcohol found in decedent’s blood, the evidence as to that percentage does not tend to prove decedent was under the influence of alcohol. At the present time, the scientific foundation for such a test for sobriety is not so well established, and known that a court can take judicial notice as to its significance. Therefore, a jury, without the guidance of expert testimony, should not be permitted to speculate as to its significance. Cf. City of East Cleveland v. Ferell, 168 Ohio St., 298, 301, 154 N. E. (2d), 630. There is no evidence of anything that decedent did or failed to do either before or after the time of the collision which could be considered as any indication that he was under the influence of alcohol; and his wife, who was with him, testified positively that he was not and that what he was doing and saying just before the collision indicated that he was not.
It is apparent that the foregoing fragmentary evidence, although it may amount to a scintilla of evidence that decedent was under the influence of alcohol at the time of the collision, certainly would not be sufficient to enable reasonable minds to conclude that he was. Hence, the issue, that arose from the allegations in the petition as to whether decedent was driving under the influence of alcohol, was an issue which should have been withdrawn from consideration by the jury.
As our subsequent discussion herein will indicate, even assuming that decedent had been under the influence of alcohol at the time of the collision, ■ it is difficult on the facts of this case to conceive of any reasonable basis for a finding of any proxi *152 mate causal relationship between that fact and plaintiff’s injuries. Manley v. Simpson, 168 Ohio St., 458.
It is contended that defendant’s request to the court “to withdraw the issue of” decedent’s “intoxication” did not amount to a “ request to withdraw from the jury the allegation that” decedent “was driving * * * under the influence of alcohol.” We do not believe there is any substance to that contention. Neither the trial judge nor plaintiff’s counsel could reasonably have understood that the foregoing request by defendant was not intended as a request to withdraw the issue of decedent’s driving under the influence of alcohol.
In stating that the verdict was not tested by interrogatories, that it is not known what weight the jury gave to this issue, and that there is other evidence from which the jury could easily have found decedent negligent, plaintiff apparently is arguing that any error in refusing to withdraw this issue from consideration by the jury did not prejudice defendant. We will therefore consider whether there is any evidence.in the record that will support any other allegations in the petition as to the negligence of the decedent.
The petition alleges that decedent was driving at more than 50 miles an hour and “at a rate of speed * * * unreasonable and dangerous to life and limb, considering the width of the road, the volume of traffic and locality.” There is evidence that decedent’s car was going 50 miles an hour but no evidence of any greater speed. His statement that he did not know what his speed was but that he never drove over 60 miles an hour does not represent an admission by him that he was driving over 50 at the time of or immediately before the collision. At the time and place of the collison, a speed of 50 miles an hour or less was, under our statute, prima facie kwful. Section 4511.21, Revised Code. There is no claim that the width of the road was such as to support a reasonable conclusion that, at this time of night, a speed of 50 miles an hour might be unreasonable or dangerous. Admittedly, the volume of traffic at 1:10 a. m. at this locality was very slight and admittedly decedent had the green light. Also, during the trial, the court, at defendant’s request and with the express agreement of plaintiff, withdrew from consideration by the jury the allegations of the petition that decedent “failed to operate * * * in such a manner as to be able to *153 stop within the assured clear distance ahead.” Hence, it is apparent that there is no evidence of speed which could reasonably support a finding of decedent’s negligence.
The petition alleges that decedent “wholly failed to heed the siren and flasher light signals being given” by the police car. Admittedly there is no evidence that decedent either saw the flasher light signals or heard the siren. The only evidence is that he did not and that, because it was cool, the windows of his car had been closed. Apparently it was and is plaintiff’s contention, although not alleged in the petition, that decedent should have seen the signals and heard the siren. See, regarding necessity of proof that he should have so seen or heard where no evidence of such seeing or hearing, McEwen Funeral Service, Inc., v. Charlotte City Coach Lines, Inc. (1958), 248 N. C., 146, 102 S. E. (2d), 816; City of Seattle v. Lough (1954), 45 Wash. (2d), 286, 273 P. (2d), 984; Russell v. Nadeau (1943), 139 Me., 286, 29 A. (2d), 916; 5A American Jurisprudence, 416, Section 300. In support of that contention, plaintiff relies largely upon the testimony of two disinterested witnesses who were driving together in an easterly direction toward the intersection where the collision occurred on the same road as and toward the police car. They testified as follows: ■ •
(Mrs. Pennypacker.)
“Q. How far were you from that red flashing light when you first observed it? A. I am not real sure as far as the distance, possibly a couple of city blocks anyway.
< < $ # *
“Q. What did you do? A. Well, I immediately, I was slowing down for the red light that was at the corner and I pulled off the road to the right, to the side of the road before I got to the intersection.
“Q. Did you bring your car to a stop? A. I stopped immediately because I wanted to get out of the way of any emergency vehicle.
t < K * *
“Q. Well, what if anything did you hear? A. After the red light flashed for almost, not right away — we did hear the siren of the vehicle blowing. * # * all I know is I heard a siren, and I heard the burst of sound, I know that it was a siren.
í Í # # *
*154 “Q. It was after you heard the siren or after you saw the light that you pulled off to the side of the road and stopped, is that right? A. Well, first I started slowing down immediately on seeing the light and as I was slowing down I heard the siren. ’ ’
(Mrs. Comer.)
‘ ‘ Q. How far were you from this police car, * * * when you first saw the lights flashing? A. I think about 200 feet. # * # I think it was farther than that, it would be more, about two city blocks.
< C * •*
“Q. How about the siren; how far were you from it when you first heard it? A. That’s about the same time as the red light.
Í < # # *
‘ ‘ Q. I believe you indicated the police ear was about a block away from the intersection when you first saw it. A. Two blocks.”
Plaintiff argues that the foregoing testimony indicates that the siren was audible 1,000 feet ahead of the police car. This argument is based on the assumption that the city block referred to by those witnesses represented;500 feet, an assumption not supported by any evidence in the record. Plaintiff then argues that there is evidence in the record (in one of the police investigation reports) from which it may be inferred that, when decedent was at a point 226 feet north of the place of collision, decedent had an unobstructed view in the direction from which the police car was approaching. Plaintiff does not even suggest that there is evidence tending to prove no obstruction to decedent’s view before that point. In view of the fact that an automobile traveling as decedent apparently was at a lawful speed of 50 miles an hour will necessarily traverse over 73 feet a second and in view of the facts, that.the decedent was traveling late at night on a lightly traveled road in the country with his windows closed (as he reasonably and lawfully might have them closed) and was approaching a green traffic light and thus apparently had the right of way, it cannot be said that he should, in the 226 feet before the collision, have either seen the flashing red light or heard the siren of the police car in time to modify the operation of his automobile. There, admittedly, is *155 no evidence that he did. Furthermore, it is significant that, although the police car was running through a red light, there is no evidence that anyone in it Was aware of the approach of decedent’s car until the police car was about 10 or 15 feet from the collision. If (as the evidence indicates without dispute) the approach of decedent’s car was not observed by either plaintiff or the driver of the police car until such a short distance from the point of collision, how could it reasonably be determined that decedent, who had the green light and was undoubtedly relying upon it, should have observed the approach of the police car in time to do anything to avoid the collision? The evidence discloses without dispute that the siren was so located under the hood of the police car as to project its sound forward. The fact, assuming as plaintiff argues that there was evidence to establish it, that the siren could be heard 1,000 feet ahead would hardly tend to prove that it should have been heard at any substantial distance to the side of the police car.
Plaintiff’s petition alleges also that decedent “wholly failed to yield the right of way to the auto in which plaintiff was riding, as required by the statutes of # * * Ohio.”
In support of that allegation, plaintiff relies on Section 4511.45, Eevised Code, which reads so far as pertinent:
“Upon the approach of an emergency vehicle, equipped with at least one flashing red light visible under normal atmospheric conditions from a distance of 500 feet to the front of such vehicle and the driver is giving audible signal by siren, exhaust whistle, or bell, the driver of every other vehicle shall yield the right of way, immediately drive to a position parallel to, and as close as possible to, the edge or curb of the highway clear of any intersection, and stop and remain in such position until the emergency vehicle has passed, except when otherwise directed by a police officer.
éí* m *
“This section does not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property upon the highway.” (Emphasis added.)
It is apparent from the emphasized words “to the front” that this statute may have been intended merely to require *156 vehicles in front of an emergency vehicle to yield the right of way to snch emergency vehicle. If we assume that this statute could be construed to provide for the right of way of an emergency vehicle over a vehicle approaching from the side (the definition of “right of way” hereinafter quoted tends to indicate it should be so construed), we do not believe that the evidence in the instant case can reasonably support a conclusion that the police car was, at the time of the collision, exercising any right of way to which decedent was required to yield by that statute.
Section 4511.01 (EE), Eevised Code, provides so far as pertinent:
“ ‘Eight of way’ means the right of a vehicle * * * to proceed uninterruptedly in a lawful manner in the direction in which it * * * is moving in preference to another vehicle * * * approaching from a different direction into its * * * path. ’ ’
In accordance with those statutory words, this court has held that, where a vehicle “is not proceeding in a lawful manner in approaching or crossing the intersection * * * such vehicle loses its preferential status.” Morris v. Bloomgren, 127 Ohio St., 147, 187 N. E., 2, 89 A. L. R., 831.
Prior to the enactment of Section 4511.03, Eevised Code, this court had indicated by its decision in Swoboda v. Brown, 129 Ohio St., 512, 196 N. E., 274, that it would have been unlawful for the police car in which plaintiff was riding to enter the intersection against the red traffic signal as it admittedly did.
Section 4511.03, Eevised Code, reads:
“The driver of any emergency vehicle, when responding to an emergency call, upon approaching a red or stop signal * * # shall slow down as necessary for safety to traffic, but may proceed cautiously past such red or stop sign or signal with due regard for the safety of all persons using the street or highway.”
On the evidence in this record, reasonable minds cannot conclude that, in approaching the red traffic signal at this intersection, the police car slowed down “as necessary for safety to traffic”; and they cannot conclude that the police car proceeded *157 “cautiously past such red * * * signal with” any regard whatever for the safety of persons using the street or highway. Under the foregoing statute, an emergency vehicle may lawfully proceed past a red traffic signal but only if, on approaching such signal, it slows down as necessary for safety to traffic and only if it proceeds cautiously past such signal with due regard for the safety of all persons using the street or highway. It is obvious that a police car that enters an intersection against a red traffic signal at 40 miles an hour and collides with an automobile proceeding through the intersection on a green light at what would ordinarily be a lawful speed is not proceeding in a lawful manner and has no right of way whatever. See Russell v. Nadeau, supra (139 Me., 286); Calvert Fire Ins. Co. v. Hall Funeral Home (La. 1953), 68 So. (2d), 626; City of Kalamazoo v. Priest (1951), 331 Mich., 43, 49 N. W. (2d), 52; and 5A American Jurisprudence, 417, Section 300.
Although the petition states the conclusion that decedent “failed to keep his automobile under proper control,” plaintiff apparently does not rely upon any such failure, except to the extent any such failure may have been specified by the allegations of the petition to which we have hereinbefore referred. There are no other allegations of the petition as to any act or failure to act of decedent.
In our opinion, therefore, it is at least very doubtful whether the evidence is sufficient to support a finding that decedent was negligent in the respects alleged in the petition. It necessarily follows that the trial court’s error, in refusing to withdraw from consideration by the jury the issue of decedent’s driving under the influence of alcohol, was prejudicial to defendant. See Hallworth v. Republic Steel Corp., 153 Ohio St., 349, 91 N. E. (2d), 690.
This disposes of plaintiff’s fourth assignment of error; and, since it requires an affirmance of the judgment of the Court of Appeals, it also necessarily disposes of the first assignment of error that the court “erred in reversing and in not affirming the judgment of the” trial court and of the fifth assignment of error that “the judgment of the Court of Appeals is contrary to law.”
*158 It is reasonably arguable that, since we are of the opinion that one of the errors found by the Court of Appeals will support its judgment of reversal and thus will necessarily require this court to affirm that judgment of the Court of Appeals, it is unnecessary for us to consider whether the Court of Appeals was correct with respect to its findings of other errors, and we should therefore refrain from any comment with respect to any such findings of other errors even where appellant’s assignments of error specifically question such findings. If the judgment of this court would end the litigation without any further trial, as where it would result in a final judgment for one party or the other, it is clear that any such comment would amount to a dictum and should be avoided. However, in Section 2505.21, Revised Code, it is stated:
“ * * * All errors assigned and briefed shall be passed upon by the court. * * * In every case where a judgment or an order is reversed and remanded for a new trial or hearing, in its mandate to the court below, the reviewing court shall state the errors found in the record upon which the judgment of reversal is founded.”
The instant case clearly indicates the reason for such a rule where the effect of a judgment will be a remand to the trial, court for a new trial. If this court affirms the judgment of reversal by the Court of Appeals because it agrees with the finding by that court of error in “submission to the jury of the issue arising from the allegation that * * * decedent was driving under the influence of alcohol” but does not pass upon the plaintiff’s assignment that the Court of Appeals erred in finding that the trial court erred “in refusing to instruct the jury upon the subject of joint enterprise and imputed negligence,” then, on retrial, the Common Pleas Court will probably follow the Court of Appeals and instruct upon that subject. This court might then have to set aside a judgment rendered at that retrial for error in instructing upon that subject, an unfortunate eventuality which can be avoided if this court now passes upon the assignment of error relating to the propriety of instructions upon that subject. Hence, where the effect of our judgment in a cause will be a remand of the cause to the Common Pleas *159 Court for a new trial, the Supreme Court will ordinarily pass upon all those errors assigned by an appellant which involve matters likely to arise on a new trial.
Plaintiff’s third assignment of error is that “the Court of Appeals erred in finding and holding that the Court of Common Pleas erred in refusing to explain to the jury its action in dismissing the cross-petition.” 'In view of the fact that defendant has not appealed from the judgment of the Court of Appeals holding that the trial court properly disposed of the cross-petition, it is clear that this assigned error does not relate to any matter likely to arise on a new trial. Hence, we believe that anything we might say with respect thereto would represent dicta.
Plaintiff’s second and his only other assignment of error in this court is that “the Court of Appeals erred in finding and holding that the Court of Common Pleas erred in failing to charge the jury on the issue of joint enterprise.” This court will pass upon that assigned error because, in any retrial, it is probable that this question will arise again.
In reaching its conclusion on this question, the Court of Appeals relied largely upon Lacey, Admx., v. Heisey, 53 Ohio App., 451, 5 N. E. (2d), 699, and to a lesser extent upon Comment f under Section 491, Eestatement of the Law of Torts, and upon Deitz v. Chandler, 40 Ohio Law Abs., 10, 56 N. E. (2d), 937, and it endeavored to distinguish Bloom v. Leech, Admr., 120 Ohio St., 239, 166 N. E., 137, Cambridge Home Telephone Co. v. Harrington, 127 Ohio St., 1, 186 N. E., 611, Morrow v. Hume, Admx., 131 Ohio St., 319, 3 N. E. (2d), 39, and comment d under the foregoing section of the Eestatement. In support of that conclusion, defendant relies in this court principally upon Lacey v. Heisey, supra, and to a large extent on the foregoing comment f and on New York, Chicago & St. Louis Rd. Co. v. Kistler, 66 Ohio St., 326, 64 N. E., 130. He also refers to Mitchell, Admx., v. Great Eastern Stages, Inc., 60 Ohio App., 144, 19 N. E. (2d), 910, Simensky, Admx., v. Zwyer, 40 Ohio App., 275, 178 N. E., 422, Black v. Gorey, 19 Ohio App., 49, and Franklin Asphalt Paving Co. v. Marsh, 44 Ohio App., 168, 184 N. E., 768, and relies upon several decisions from outside Ohio. We were substantially influenced in allowing plaintiff’s motion *160 to certify in the instant case by onr difficulty in reconciling the decision of the Court of Appeals on this question with East Ohio Gas Co. v. O’Hara, 17 Ohio App., 352.
The facts that are pertinent to a consideration of this question are not in dispute. Plaintiff and Bilek were Toledo police officers of equal rank and responsibilities whose duties and responsibilities included the operation of a Toledo police car equipped with a siren, flasher light and two-way radio. Since there was no regulation or order by their superiors as to which of them was to drive, they determined to and did take turns driving on alternate days. Apparently, where not directed otherwise by their superiors, their stops and routes of travel were determined by mutual agreement between them. The driver also operated the siren and flasher light. The one not driving operated the two-way radio. On the day of the collision involved in the instant case, Bilek was driving and plaintiff was operating the radio.
It should be noted that the trial court did submit to the jury the question whether plaintiff was negligent under the circumstances of danger involved in this emergency run in failing to do something to prevent the collision. See Hooking Valley Ry. Co. v. Wykle, Jr., a Minor, 122 Ohio St., 391, 171 N. E., 860; Toledo Railways & Light Co. v. Mayers, 93 Ohio St., 304, 112 N. E., 1014. • However, the Court of Appeals held that the trial court erred in failing to charge on the issue of joint enterprise, with the result that the jury was thereby prevented from considering whether any negligence of Bilek should be imputed to plaintiff. Obviously, the imputation of the negligence of a driver to a passenger is different from merely charging the passenger with his own negligence.
In New York, Chicago & St. Louis Rd. Co. v. Kistler, supra (66 Ohio St., 326), paragraph eight of the syllabus reads:
“While the doctrine of imputed negligence does not prevail in this state, yet where two or more persons take an active part in a joint enterprise, the negligence of each, while so actively engaged, must be regarded as the negligence of all.” (Emphasis added.)
In the opinion by Burket, J., at page 342, it is stated:
“The court * * * charged * * * that the negligence, if any, *161 of the father was not imputable to the daughter. * * * The father being nearly deaf, took the daughter along to hear for him * * *.
“If it be true that she was to do the.listening, and also to assist in the looking while he was doing the driving, they were engaged in a joint enterprise, and each would * # * be chargeable with the negligence of the other.
“ * * * the negligence of a servant is imputable to the master, because he is the superior. * * # On principle and sound reason the rule should be applied to those who take an active part in a joint enterprise.” (Emphasis added.)
The Kistler case, so far as it considered joint enterprise, has been noticed only twice before by this court. In Toledo Railways & Light Co. v. Mayers, supra (93 Ohio St., 304), at 311, it was distinguished and not applied. In the leading case of Bloom v. Leech, supra (120 Ohio St., 239), it was said in the opinion by Day, J., after referring to the Kistler case:
“ * * * the duty to listen was upon the daughter * * * and to assist in the looking, and the control of the enterprise was therefore with the daughter as to the obligation to listen before going upon the track. She had the right to control to this extent.
“The principle of joint enterprise is based on partnership or mutual agency.[2] In crossing accidents of this character, the test in determining the question is whether the parties were jointly operating or controlling the movements of the vehicle in which they were riding. There must be a right of mutual control. Where the guest has no voice in directing and governing the movements of the automobile, he cannot be said to be engaged in a joint venture with the driver, within the meaning of the law of negligence.
íí# m #
*162 “* * * the utmost that could be claimed on behalf of joint enterprise is that Bloom was to tell upon what road Boeder lived, and, when approaching the crossing where the accident took place, Snyder directed Bloom to look back along the track and see if any streetcar was approaching from the west, coming eastward, and report. It does not appear that Bloom had any power or control over the vehicle in which they were riding, or that he had any such authority as would show that he had joint control with Snyder, the owner and driver * * *. Whatever his report * * #, it was entirely optional with the driver and owner, Snyder, whether he would act upon such report. At any rate, Bloom had no authority or right of control in the premises. It is true that the purpose of the trip was to secure Boeder’s signature as a surety upon the note, and this, of course, was beneficial to both Snyder and Bloom; but the purpose of the trip did not comprehend joint operation or control of the automobile in which they were riding.”
The syllabus reads in part:
“2. A ‘joint enterprise’ within the law of imputed negligence is the joint prosecution of a common purpose under such circumstances that each member of such enterprise has the authority to act for all in respect to the control of the agencies employed to execute such common purpose.”
In our opinion, there is nothing in any of our syllabi, decisions or opinions which tends to indicate that the negligence of Bilek should be imputed to plaintiff. There is no evidence tending to prove that, while Bilek was driving, plaintiff was to or did have any power or control over the driving. Bilek and plaintiff were employees of equal rank and each was acting for his employer at the time. Neither had any control or authority over the other. Neither their vehicle nor Bilek’s physical or mental condition (compare the inability of the father to hear in the Kistler case) required plaintiff’s active participation in the driving.
In his brief, defendant concedes that “the bulk of the cases” in Ohio “fail to find a joint enterprise” in the operation of a ' vehicle, and also that “there are no Ohio cases as to joint enterprise of police officers.” The cases outside Ohio dealing with *163 joint enterprise in the operation of an automobile are very numerous. See annotations, 95 A. L. R., 857; 80 A. L. R., 312 ; 63 A. L. R., 909, at 921; and 48 A. L. R., 1055, at 1077. It is significant that defendant has been unable to refer to any decision by a court of last resort, and we have been unable to find any such decision, holding that, where two or more police officers, or similar public officers such as firemen, who have equal ranks and responsibilities, are in joint charge of an emergency vehicle on an emergency run, the negligence of the driver in its operation may be imputed to any other officer in the vehicle. The decisions generally hold that in such a situation the driver’s negligence may not be so imputed.
In Bartholomew v. Oregonian Publishing Co. (1950), 188 Ore., 407, 216 P. (2d), 257, holding that the trial court erred in submitting to the jury the question of whether a police officer and the driver of the police car in which he was riding were engaged in a joint enterprise, it is said in the court’s opinion by Hay, J.:
“In the case at bar, there was a total lack of evidence, direct or circumstantial, of the existence of any common enterprise between plaintiff and the driver of the police car, of such sort that each had the right to direct or control the movement of the car. There was no joint venture or quasi-partnership relationship.
“ ‘The doctrine of imputed negligence, when asserted in cases involving a joint enterprise, rests upon the maxim ‘‘ qui facit per alium, facit per se.” In such cases, in order to impute the negligence of the driver to another person riding in the car, the parties must stand in such relation to each other that the maxim just quoted directly applies to their case. * * * That maxim can apply only in cases where the relationship of the parties is in effect that of partnership, principal and agent, or master and servant, or when the circumstances are such that the vehicle, though manually operated by one person, is in the actual control of another.’ * * *”
Tn Veek, Admr., v. Tacoma Suburban Lines, Inc. (1956), 49 Wash. (2d), 584, 304 P. (2d), 700, holding that the driver’s negligence could not be imputed to the chief of a three-man *164 crew on a fire truck responding to an alarm, it is said in the opinion by Finley, J.:
“Respondent makes the additional argument * * * that, regardless of the existence of a joint enterprise, the negligence, if any, of the driver should be imputed to the decedent because the latter had the right of control. * * *
ÍÍ# # *
“Although the right of control over the driver is not sufficient by itself to justify an application of the doctrine of vicarious liability, it is a factor to be considered with all other circumstances in determining whether the decedent was guilty of independent contributory negligence which would be a bar to recovery. In other words, negligence, if any, of the driver would become a factor in the instant case only if the decedent failed properly to supervise or direct the driver after the decedent had a reasonable opportunity to see or to know that the driver was operating * * * the fire truck ‘without due regard for the safety of others ’***.”
In Shuster v. McDermit, 104 N. J. L., 58, 140 A., 421, affirming a judgment on a directed verdict in an action to recover damages from a deputy fire chief for negligence of the driver of a fire truck in charge of that deputy fire chief, it is said in the opinion by Gummere, C. J.:
“The two defendants were engaged in a common employment, serving the same master * * *. They were fellow servants, and the fact that one of them held a superior position did not change this status. * * * As a consequence of this relationship, each was responsible for the results of his own negligence, but not for those arising solely out of the negligence of the other.”
In Clough v. Schwartz, 94 N. H., 138, 48 A. (2d), 921, where a fire department lieutenant had sued for injuries received in a collision, it is said in the opinion by Kenison, J.:
“The jury were properly instructed that any negligence of * * * the fireman driving the fire truck, was not imputable to the plaintiff. * * *
“The doctrine of imputed negligence * * * has been definitely limited to cases where there was a right to control in the relationship of master and servant, principal and agent or a joint enterprise.”
*165 In Denver Tramway Co. v. Orbach, 64 Colo., 511, 172 P., 1063, it is said in the opinion by Teller, J.:
“The plaintiff was one of a party of policemen * * * riding in a city automobile * * *.
“* * * negligence * * * [is] to be imputed to a passenger only in those exceptional cases in which 'the injured person is in a position to exercise authority or control over the driver.’
“The imputation of negligence in cases of a 'joint enterprise’ has the same basis, it being properly assumed that the several parties to the enterprise will each have a voice in its management, and hence have the right to exercise control over a driver, when the parties are traveling in furtherance of the enterprise. Each is in effect the agent of the others in the line of their undertaking.
“Here there was no such community of interest as to make any member of the party the agent of another, nor did the policemen have any control over the chauffeur. They were acting in the line of their official duty, and the enterprise was one in which the whole public was interested as much as they were. They had no voice in the selection of the chauffeur, but were obliged to go with him when so directed by their superior officer. * * *
“Clearly, the policemen were not riding in the automobile in the prosecution of a common enterprise, in the sense in which that term is used in the decisions on which counsel rely.” (Emphasis added.)
In McBride, Admx., v. Des Moines City Ry. Co., 134 Iowa, 393, 109 N. W., 618, it is said in the opinion by McClain, C. J.:
“* * * YVe are satisfied, however, that the facts do not afford the slightest occasion for applying or even discussing the common enterprise rule. The deceased was not riding on the hose wagon in the prosecution of any common enterprise in which he and the other members of the fire department had voluntarily engaged, but in the pursuance of his individual duty as a member of the fire department and in that capacity the servant of the city. He had nothing to do with the selection of the driver, and he had no control over his acts. Under such circumstances it has been frequently held by other courts that *166 there is no relation of common enterprise which would justify the imputation to the deceased of any negligence on the part of the driver of the hose wagon.”
Although Bofill v. New Orleans Ry. & Light Co., 135 La., 996, 66 So., 339, where the negligence of the driver of a police wagon on an emergency run was imputed to the officer in charge of the wagon, appears to be irreconcilable with the holdings in the above-cited Washington, New Jersey and New Hampshire cases, it does not support the defendant’s position, because there is no evidence in the instant case that plaintiff had any authority over Bilek.
Comment d under Section 491 of the Restatement of the Law of Torts reads :
“Fellow servants in vehicle. The fact that the plaintiff and the driver are fellow servants of a common master and are both acting in the course of their master’s employment and in furtherance of his business does not make them participants in a joint enterprise, and this is true irrespective of whether the vehicle is owned by the master, the fellow-servant driver or by the plaintiff himself.”
The Court of Appeals held and the defendant contends that this is not inconsistent with a conclusion that plaintiff and Bilek were engaged in a joint enterprise in driving the police car at the time of the collision; and, in support of such a conclusion, they rely upon comment f under that section which reads: “Joint possession of vehicle. The fact that the driver and another riding with him are in joint possession of the vehicle is sufficient to make any journey taken by them therein a joint enterprise irrespective of whether the journey is or is not made for a common business purpose. This is so not only when the joint possession arises from a joint hiring but also when it results from a joint ownership.”
In our opinion, “the joint possession” meant by the foregoing comment is a possession for themselves, — not a possession by them for someone else. This opinion is supported by the last sentence of the comment. Where the driver and the rider have hired, borrowed or acquired ownership of a car for their own use, the proprietary interest which each has might *167 reasonably be held to support an inference that each has control over it. See for example Lucey v. John Hope & Sons, Engraving & Mfg. Co., 45 R. I., 103, 120 A., 62; Hinkle v. Union Transfer Co. (C.C.A.10-1955), 229 F. (2d), 403; and El Paso Electric Co. v. Leeper (Texas Comm. Appeals), 60 S. W. (2d), 187, relied upon by defendant. Cf. Ross v. Burgan, 163 Ohio St., 211, 126 N. E. (2d), 592, holding that, “where the owner of a motor vehicle being driven by another is an occupant thereof, * * * [an] * * * inference arises that the owner has control over it and * * * the driver is acting as his agent in operating the vehicle.” Where, however, the possession of the driver and of the rider is only a possession for their common employer and for performance of the duties owed to that employer, there would be no such reason or basis for implying any right of the rider to control the driver in the performance of his duty of driving for the common employer. The right to control would then remain in the employer especially where, as in the instant case, the employer had not given the rider any authority over the driver.
Thus, in Bernard, Admx., v. Jennings (1932), 209 Wis., 116, 244 N. W., 589, defendant and Bernard were employees of a company engaged in the business of operating trucks which carried automobiles. The men took turns operating the truck and while one was driving the other slept, at least part of the time. On the trip, they procured the needed gasoline and provided their own meals and lodging. In the court’s opinion by Rosenberry, C. J., it is said:
“Being co-employees, the mere fact that they were assisting each other in the performance of a duty which they owed to their common employer does not warrant holding that they were engaged in a joint enterprise as that term is used in the law of negligence.”
In Melville v. State of Maryland (C.C.A.4-1946), 155 F. (2d), 440, it is said in the opinion by Dobie, J.:
“Appellant also complains of the instruction * * * that any negligence of Ewell, who was driving the Acme truck at the time of the accident, was not to be imputed to Morris under the doctrine of joint enterprise. * * * The evidence showed that Morris and Ewell had equal authority to drive the Acme truck *168 and that the one who was not driving was permitted to sleep in a bunk located above and behind the driver’s seat. No evidence indicated that the one of the two who was not driving had any measure of control over, or responsibility for, the acts of the one who was driving.
a # * #
“The doctrine of imputation of negligence, in fields such as that here involved, does not seem to be highly favored by the courts. For the application of the doctrine, there must exist something in the nature of a mutual agency, contractual or quasi-contractual, akin to a partnership of limited purpose and Gxt6nt ^ ^
In Kocher v. Creston Transfer Co. (C.C.A.3-1948), 156 F. (2d), 680, Meglino had been sent with a truck-tractor and loaded trailer to Pittsburgh. His tractor broke down and Kocher was assigned to take another truck-tractor, pick up Meglino and the loaded trailer, and proceed to Pittsburgh. Apparently, they took turns driving and, while Meglino was driving, there was a collision. In holding that his negligence could not be imputed to Kocher, it is said in the court’s opinion by Kalodner, J.:
“ ‘The injection into judicial discussion of this class of cases of the phrases “joint enterprise” and “common purpose” has made not for clarity but for confusion * * *.
“ ‘There is no legal distinction between the phrases “joint enterprise” and “the prosecution of a common purpose.” Anything that two or more persons are engaged in may with equal correctness be characterized by either phrase. If a driver of an automobile and a passenger in that automobile are “prosecuting a common purpose” in motoring, the passenger may or may not have any right to a share in the control of that automobile. If such a right to share in a vehicle’s control is alleged, it must be proved. * * *
“ ‘It is only when the driver is the servant or agent of the passenger at the time of the negligent act and that act is committed within the scope of the servant’s or agent’s employment, or when the driver and the passenger are business partners and the operation of the vehicle is in furtherance of the partnership business, that the negligence of the driver will from the mere *169 relationship of the parties be imputable to the passenger. In all other cases the test is, did the passenger , have a right to a share in the control of the vehicle? Responsibility is commensurate with authority.’ ”
Of the other decisions from outside Ohio relied upon by defendant, the only one which we believe requires any comment is Alabama Great Southern Rd. Co. v. Hanbury, 161 Ala., 358, 49 So., 467, in which the opinion by way of dictum states that' the negligence of an engineer of a train might be imputed to the plaintiff conductor because they were engaged in a joint enterprise in the operation of a train. The court actually held that a demurrer to the plea raising this defense was properly sustained because it did not aver the negligence of the engineer as a proximate cause. That dictum is irreconcilable with the following decisions: Grace, Admx., v. Minneapolis & St. Louis Rd. Co., 153 Iowa, 418, 133 N. W., 672; Chicago & A. Rd. Co. v. Vipond, Admr., 212 Ill., 199, 72 N. E., 22; and Chicago, St. Paul & Kansas City Ry. Co. v. Chambers (C.C.A.8-1895), 68 F., 148.
In our opinion, it would be unreasonable to impose upon an employee responsibility for the negligence of his co-employee. Unlike an employer, an employee has no right to choose his co-employees. That choice is the right (possibly apart from present-day union interference therewith) of his employer. Hence, although it may be reasonable to impose responsibility on an employer for what his employee does, it does not follow that it would be reasonable to impose any such responsibility on a co-employee for what that employee does. We believe therefore that imputation of negligence because of a joint enterprise should be confined to the kind of a joint enterprise where a member thereof can select his joint adventurers, just as a partner can select his partners and an employer can select his employees. In such instances, there is some justification for making a member of the joint enterprise responsible for what another member does in its execution.
Our conclusion is that, where two police officers of equal rank and responsibility are given possession of a police car and each has authority to drive it and they determine between themselves when each shall drive, they are not engaged in a joint enterprise in operating that car on an emergency run so as to re *170 quire imputation of the negligence of the driver to the one not driving.
What we have said disposes of all plaintiff’s assignments of error.
Although she did not file any notice of appeal, defendant has filed an assignment of error in this court that “the Court of Appeals erred in failing to render final judgment for defendant,” and she contends that, because she made motions at the close of plaintiff’s case and again at the conclusion of all the evidence for a directed verdict, she may rely upon that assignment of error in this court without any cross-appeal. In support of this contention, Hrovat v. Cleveland Ry. Co., 125 Ohio St., 67, 180 N. E., 549, 84 A. L. R., 215, is cited. That case however was decided under statutes which were replaced when our appellate practice statutes were later completely revised.
This court has consistently held that there is no right to an appeal from the decision of any tribunal except such as may be conferred by statute or by the Constitution (see In re Mahoning Valley Sanitary District, 161 Ohio St., 259, 119 N. E. [2d], 61), and that a condition precedent to an appeal from a judgment of any court is the filing of a notice of appeal in that court within the time specified by the Appellate Procedure Act. See Volz v. Volz, 167 Ohio St., 141, 144, 146 N. E. (2d), 734. Admittedly, no such notice of appeal was ever filed by defendant in the Court of Appeals.
Section 2505.22, Revised Code, provides in part:
“Assignments of error may be filed in behalf of an appellee which shall be passed upon by a reviewing court before a judgment or order is reversed in whole or in part.”
Obviously this section of the Code authorizes the assignment of error filed on behalf of defendant, but it indicates by its words that such an assignment of error “shall be passed upon * * * [only] before a judgment or order is reversed.” There is nothing in the statute to indicate that such assignments of error shall necessarily be passed upon where, as here, the judgment of the Court of Appeals is being affirmed.
Those words indicate the limited purpose to be served by assignments of error by an appellee, where such appellee has not filed a notice of appeal. They are apparently to be con *171 sidered only for the purpose of preventing a reversal of the judgment under review.
In the instant ease, for example, if this court had determined that the Court of Appeals had erred in finding each of the errors that it found as a basis for its reversal of the judgment of the trial court, then, before reversing the judgment of the Court of Appeals, this court would have had to pass upon the assignment of error by the defendant. In that event, if this court had found that defendant’s assignment of error was well taken and that the Court of Appeals should have rendered final judgment for defendant, it would have been required to affirm the judgment of the Court of Appeals. In other words, it may be said that an assignment of error by an appellee, where such appellee has not filed any notice of appeal from the judgment of the lower court, may be used by the appellee as a shield to protect the judgment of the lower court but may not be used by the appellee as a sword to destroy or modify that judgment.
It may be suggested that, if, in the instant case, this court could determine that the evidence at the trial was insufficient to justify submission of the cause to the jury, it would be futile for this court to remand the cause to the trial court for a new trial, which will be the effect of the mere affirmance in the instant case of the judgment of the Court of Appeals. The answer to any such suggestion is that additional evidence may properly be admitted at another trial of the cause.

Judgment affirmed.

Weygandt, C. J., Zimmerman, Matthias, Bell and Herbert, JJ., concur.
Peck, J., not participating.

Although not referred to by plaintiff, one of these two officers testified in accordance with this report; and the testimony of decedent’s wife, who was with him throughout the evening, corresponds with what their report indicates the decedent said to them on this subject.

It may be noted that our recent decisions, considering whether a relationship of joint enterprise existed, have indicated the necessity of a combination between the members thereof for the conduct of some line of trade or some business for their joint profit. Bennett v. Sinclair Refining Co., 144 Ohio St., 139, 57 N. E. (2d), 776; Shaver v. Shirks Motor Express Corp., 163 Ohio St., 484, 491, 492, 127 N. E. (2d), 355; Ford, Exr., v. McCue, 163 Ohio St., 498, 127 N. E. (2d), 209.